Carolina MORALES et al.,
Plaintiffs, Appellants,

v.

SOCIEDAD ESPAÑOLA DE AUXILIO
MUTUO Y BENEFICENCIA et
al., Defendants, Appellees.

No. 07–1951.

United States Court of Appeals,
First Circuit.

Heard March 3, 2008.

Decided April 18, 2008.

Pedro F. Soler–Muñiz for appellants.

Juan A. Pedrero Lozada, with whom Arroyo, Monrouzeau, PSC, was on brief, for appellees.

Before BOUDIN, Chief Judge, TORRUELLA, Circuit Judge, and SELYA, Senior Circuit Judge.

SELYA, Senior Circuit Judge.

This appeal requires us to determine for the first time what it means to "come[ ] to" a hospital's emergency department within the purview of the Emergency Medical Treatment and Active Labor Act (EMTA-LA), 42 U.S.C. § 1395dd. After carefully considering the language of EMTALA, the regulation addressing the pertinent statutory text, and the policies that underlie the statute, we hold that an individual can come to the emergency department for EMTALA purposes without physically arriving on the hospital's grounds as long as the individual is en route to the hospital and the emergency department has been notified of her imminent arrival. We therefore reverse the order terminating the action and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Because this case was resolved on summary judgment, we take the facts in the light most favorable to the nonmovant (here, plaintiff-appellant Carolina Morales),[1] consistent with record support. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990).

On March 10, 2004, the plaintiff's obstetrician diagnosed her as having a nonviable ectopic pregnancy. While at work two days later, the plaintiff experienced severe abdominal pain accompanied by vomiting. Her co-workers called an ambulance. After placing the plaintiff inside, the crew of the ambulance set off for Hospital Español Auxilio Mutuo de Puerto Rico (the Hospital), an institution at which her obstetrician regularly practiced. The ambulance was not owned by the Hospital and the paramedics who manned it were not Hospital employees.

While in transit to the Hospital, the paramedics called ahead to the emergency department and notified the director, Dr. Salvador Marquez, of the plaintiff's condition, forthcoming arrival, and need for treatment. In the first of two conversations with the paramedics, Dr. Marquez seemed worried that the plaintiff might voluntarily have induced an abortion. He also stated that he was very busy and asked the paramedics to call back when they had more information about the suspected abortion.

When the paramedics telephoned again, Dr. Marquez inquired as to whether the

---

1. Morales's husband and their conjugal partnership are co-plaintiffs and co-appellants, but their claims are wholly derivative. For ease in exposition, we refer throughout to Morales as if she were the sole plaintiff and appellant.

plaintiff had medical coverage or was a member of the Hospital's insurance program. Receiving no such assurances, he abruptly terminated the call (an action that the paramedics interpreted as a refusal to treat the plaintiff at the Hospital's emergency department). Dr. Marquez at no time claimed that the Hospital was in diversionary status.[2]

Stymied by Dr. Marquez's actions, the paramedics took the plaintiff to a different facility. She was treated there.

In due season, the plaintiff brought suit against the Hospital and others for violating EMTALA and for sundry torts under local law.[3] Following discovery, the Hospital moved for summary judgment on the EMTALA count, arguing that the statute did not apply because the plaintiff had never come to its emergency department. The district court granted the motion and simultaneously dismissed the supplemental local-law claims without prejudice. *See Morales v. Sociedad Española de Auxilio Mutuo y Beneficencia*, Civ. No. 06–1039, slip op. at 9 (D.P.R. Apr. 26, 2007) (unpublished). After unsuccessfully moving for reconsideration, the plaintiff prosecuted this timely appeal.

## II. ANALYSIS

We review a grant of summary judgment de novo. *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 184 (1st Cir.1999). The starting point is to canvass the evidence in the light most flattering to the nonmovant, drawing all reasonable inferences in that party's favor. *Id.* If the record, so viewed, discloses no genuine issue as to any material fact and shows conclusively that the movant is entitled to judgment as a matter of law, we must affirm the judgment. *See* Fed.R.Civ.P. 56(c).

In this instance, a number of relevant facts are undisputed. The parties agree, for example, that the Hospital is covered under EMTALA and that it operates an emergency room. Moreover, for summary judgment purposes we can accept as givens that the paramedics opted to take the plaintiff to the Hospital; that they contacted the Hospital's emergency department while en route and made this intention known; and that they requested the Hospital to admit the plaintiff for a screening examination in order to assess (and if necessary stabilize and treat) her condition. We also can accept as true for summary judgment purposes the reasonable (though not inevitable) inference that the Hospital, after learning about the plaintiff's uninsured status, signaled the paramedics to transport her elsewhere. The question, then, is whether the plaintiff had come to the Hospital's emergency department for EMTALA purposes at the time she was rebuffed.

The plaintiff argues that once the ambulance crew decided to take her to the Hospital, set out in that direction, and contacted the director of the emergency department to facilitate her reception, she had for all practical purposes "come[ ] to" the Hospital. The Hospital demurs; it argues that EMTALA is not triggered until a prospective patient physically passes through the hospital's gates and arrives on its premises. It is, thus, readily apparent that this appeal turns on a singular and quintessentially legal question: whether, on the plaintiff's version of the facts, a reasonable jury could find that she had

---

**2.** A hospital is in diversionary status if it does not at the time "have the staff or facilities to accept any additional emergency patients." 42 C.F.R. § 489.24(b)(4).

**3.** For present purposes, we need neither catalogue the identity of the other defendants nor trace their relationship to the Hospital.

come to the Hospital's emergency department as required under EMTALA. To answer this question, we must parse that statute and the regulations thereunder, and then apply the distilled legal rules to the facts.

■ We begin, of course, with the language of the statute itself. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); *United States v. Nason*, 269 F.3d 10, 15 (1st Cir. 2001). If, after employing all the traditional tools of construction, the statute's text seems unambiguous and the ordinary meaning of that unambiguous language yields a reasonable result, the interpretive odyssey is at an end. *See Robinson*, 519 U.S. at 340–41, 117 S.Ct. 843; *Nason*, 269 F.3d at 16. If, however, the language admits of a possible ambiguity and Congress has not spoken directly to the issue, the court must look for guidance to any relevant regulations promulgated by an agency charged with administering the statute. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Muñiz v. Sabol*, 517 F.3d 29, 38 (1st Cir. 2008).

In those circumstances, a court is bound to apply the agency's interpretation of the statute, as embodied in a regulation, as long as it constitutes a permissible construction of the statutory text. *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. Determining a regulation's meaning requires application of the same principles that imbue exercises in statutory construction. *See, e.g., Cumberland Coal Res., LP v. Fed. Mine Safety & Health Rev. Comm'n*, 515 F.3d 247, 254 (3d Cir.2008); *Sidell v. Comm'r*, 225 F.3d 103, 110 (1st Cir.2000).

■ When the regulatory language remains ambiguous even after the application of those principles, an inquiring court must look beyond the letter of the regula-

tion and defer to an agency's reasonable interpretation of the regulation. *United States v. Lachman*, 387 F.3d 42, 54 (1st Cir.2004); *see Christensen v. Harris County*, 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). If, however, even that effort fails to clarify the uncertainty, the court has no choice but to step into the breach and resolve the ambiguity in the manner most consistent with Congress's discernible intent. *See Chevron*, 467 U.S. at 843, 104 S.Ct. 2778.

With this framework in place, we turn to the particulars of the statutory language at issue here. Congress enacted EMTALA in response to widespread reports that hospitals were refusing either to admit or to provide emergency treatment to indigent persons. *See Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1189 (1st Cir. 1995). In order to ensure that individuals of every socioeconomic class would be treated fairly when undergoing medical emergencies regardless of their insurance status or ability to pay, Congress crafted the statute to prohibit the "dumping" of financially undesirable patients. *See Reynolds v. MaineGen. Health*, 218 F.3d 78, 83 (1st Cir.2000) (discussing legislative intent).

EMTALA covers most hospitals; its reach extends to any hospital that participates in the federal Medicare program. *See* 42 U.S.C. § 1395dd(e)(2). The statutory scheme imposes a variety of obligations on covered institutions. First, "if any individual ... comes to the emergency department [of a covered hospital] and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination." *Id.* § 1395dd(a). Second, if the screening examination discloses that the individual suffers from an emergency medical condition, the hospital must provide

necessary stabilization. *See id.* § 1395dd(b)(1). As can be gleaned from our earlier account of the facts, this case implicates only the first of these two requirements.

That first requirement itself has two parts: the individual must (i) "come[ ] to" the emergency department and (ii) be the subject of a request "for examination or treatment." *Id.* § 1395dd(a). Here, however, there is plainly evidence of a request for treatment (this would be an entirely different case if the paramedics, while en route, had failed to contact the emergency department in order to pave the way for medical assistance for their charge). Thus, we focus exclusively on the "comes to" component of the first requirement.

■ The statute does not define the phrase "comes to the emergency department." Nor is the phrase self-elucidating: it has more than one meaning in common parlance. *See, e.g., Webster's Third New International Dictionary* 453 (1993) (defining "come" to mean variously either to move toward or approach, or to arrive at, among other definitions). Consequently, a plain meaning approach to construing this phrase does not offer a solution to the problem that confronts us. And the legislative history—beyond its emphasis on the evil to be combatted: patient dumping—is not fully illuminating. We therefore turn to the regulations.

Congress charged the Secretary of Health and Human Services (HHS) with administering EMTALA's provisions. 42 U.S.C. § 1395hh(a)(1). HHS first promulgated the contemplated regulations in 1994. *See* 59 Fed.Reg. 32,086, 32,120–21 (June 22, 1994). An amended version, promulgated in 2003, was in effect at the time of the events at issue here. *See* 68 Fed. Reg. 53,222, 53,262–63 (Sept. 9, 2003).

In the regulations, HHS elected to define the key phrase—"comes to the emergency department"—in a rather elliptical manner. The pertinent provision states that an individual has come to the emergency department if she

> [i]s in a ground or air nonhospital-owned ambulance on hospital property for presentation for examination and treatment for a medical condition at a hospital's dedicated emergency department. However, an individual in a nonhospital-owned ambulance off hospital property is not considered to have come to the hospital's emergency department, even if a member of the ambulance staff contacts the hospital by telephone or telemetry communications and informs the hospital that they want to transport the individual to the hospital for examination and treatment. The hospital may direct the ambulance to another facility if it is in "diversionary status," that is, it does not have the staff or facilities to accept any additional emergency patients. If, however, the ambulance staff disregards the hospital's diversion instructions and transports the individual onto hospital property, the individual is considered to have come to the emergency department.

42 C.F.R. § 489.24(b)(4) (2003).

The only federal appellate court to have construed this provision in order to help determine the meaning of the phrase "comes to the emergency department" is the Ninth Circuit. *See Arrington v. Wong*, 237 F.3d 1066 (9th Cir.2001). In that factually similar case, an individual was en route to the hospital in a nonhospital-owned ambulance when the paramedics contacted the hospital's emergency department to pave the way for the prospective patient's screening. *Id.* at 1069. The hospital, which was not in diversionary status, redirected the ambulance elsewhere. *Id.* at 1073.

Construing 42 C.F.R. § 489.24 (2000), an earlier but materially identical version of the current regulation, the court concluded that an individual in an ambulance that is en route to a hospital can qualify as an individual who has come to the hospital for EMTALA purposes. *Id.* at 1072. Therefore, the hospital may not turn away such an individual and deny his request for treatment unless it is in diversionary status.[4] *Id.* at 1073 (stating that the "plain language of the agency's rules" requires that outcome).

Here, the district court rejected the reasoning of the *Arrington* majority and concluded that the plaintiff had never come to the Hospital's emergency department within the meaning of EMTALA. *Morales, supra,* slip op. at 9. In reaching this conclusion, the court appropriately determined that Congress had not made clear the meaning of the phrase "comes to the emergency department." Accordingly, the court sensibly looked to the regulation for guidance. In that exercise, it focused in isolation on the second sentence of 42 C.F.R. § 489.24(b)(4). *See id.* at 8 (stating that "while the [second sentence] is helpful in interpreting the meaning of the phrase 'comes to the emergency department' within the context of EMTALA, the [third sentence] adds nothing to that interpretation").

█ In our view, the court's analysis of the regulation was flawed. To determine the regulation's meaning, an inquiring court first should apply the same set of principles that inform statutory construction. A well-established canon of construction requires that courts give all language in a statute operative effect. *See Duncan*

*v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001); *Aguilar v. U.S. Immig. & Customs Enf.,* 510 F.3d 1, 10 (1st Cir.2007); *United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 751–52 (1st Cir. 1985).

This canon is fully transferable to the construction of regulations. Thus, a court should interpret a regulation so that, "if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (quoting *Duncan,* 533 U.S. at 174, 121 S.Ct. 2120). The district court's observation that the sentence addressing diversionary status "adds nothing" to the meaning of the regulation, *Morales, supra,* slip op. at 8, flies in the teeth of this tenet.

The canons of construction counsel, therefore, that we explore the feasibility of an interpretation that reads the provision to give meaning to all four of its sentences. Although we can speculate about different ways to reconcile the seemingly inconsistent sentences and can postulate various iterations, all of these readings seem forced. Simply put, without some language qualifying the relationship between the second and third sentences, it is unclear whether a hospital may divert an approaching ambulance only when it is in diversionary status, or whether it may do so under other circumstances.

Regulatory construction—like statutory construction—is not an exact science, and there are times when contortionistic strivings at seamless interpretation must yield to common sense. This is such a time: the regulation is a hodge-podge and, despite

---

4. A dissenting judge took the position that requiring less than actual physical arrival reads the "comes to" requirement out of the statute. *Arrington,* 237 F.3d at 1075 (Fernandez, J., dissenting). He opined that the

regulation "adds an ambiguity," but read its purportedly unclear language to mean that diversionary status is merely one example of an instance in which a hospital may redirect an ambulance. *Id.* at 1076.

assiduous interpretive efforts, its overall meaning remains obscure.

In some cases, regulatory history or exogenous agency statements may help to resolve such a dilemma. *Cf. United States v. Meade,* 175 F.3d 215, 219 (1st Cir.1999) (stating courts may look to legislative history when statutory text is ambiguous). Here, however, those sources at most reveal that 42 C.F.R. § 489.24(b)(4) was promulgated in a way designed to be consistent with the decision in *Johnson v. University of Chicago Hospitals,* 982 F.2d 230 (7th Cir.1992). There, the Seventh Circuit held that a telemetry system had permissibly redirected an off-property individual when the particular hospital was in a status similar to diversionary status. *See* 59 Fed.Reg. at 32,098. That is not particularly illuminating here.

In the face of such ambiguity, we search for clarification in the agency's interpretation of its own regulation. The Hospital made a frontal attack on this ground during oral argument, asserting that language in interpretive guidelines issued by the Centers for Medicare and Medicaid Services (CMS) compels us to hold that any individual in a non-hospital-owned ambulance who is off-property has not come to the emergency department.[5] *See* CMS, *State Operations Manual* app. V, at 32 (2004) ("If an individual is not on hospital property ... th[e] regulation is not applicable."). But we find little in the way of guidance there. The quoted statement begins a paragraph in which CMS reiterates the basic components of the regulatory provision previously addressed and does nothing to ease the degree of obscurity found in the regulation itself. *See id.* (stating, in part, that "[i]f an individual is

in an ambulance, regardless of whether the ambulance is owned by the hospital, a hospital may divert individuals when it is in 'diversionary' status"). Thus, the statement furnishes no real guidance as to the question before us. Similarly, HHS's explanations of the regulation elsewhere in the Federal Register do not yield a clear answer about how the provision as a whole is meant to operate. *See, e.g.,* 59 Fed.Reg. at 32,098; 68 Fed.Reg. at 53,227–34.

The short of it is that we are left to wonder whether, if an individual in a non-hospital-owned ambulance has not yet reached hospital property, a hospital may redirect the individual for virtually any reason (including the individual's impecuniousness).

Given the imprecision of the statute and the regulation and the absence of reliable guidance from the agency, we think it is appropriate to resolve the ambiguous "comes to" language in accordance with statutory intent. First and foremost, that intent dictates that the statute and its implementing regulations must be interpreted in a way that prevents hospitals from "dumping" patients.

An interpretation of the statute concluding that an individual en route to the hospital, under the plaintiff's version of the facts, has "come[ ] to" the emergency department fits most squarely with this intent. This reading comports with EMTALA's primary goal and hinders efforts to turn away prospective patients because of their economic status. In that way, it enhances the ability of indigent individuals to receive timely first-response care.

This reading therefore avoids the perverse incentives created under the district court's contrary interpretation. That in-

---

5. CMS, formerly known as the Health Care Financing Administration, is a sub-agency within HHS. Its responsibilities include overseeing federal Medicare and Medicaid programs.

terpretation encourages easy evasion of the statutory mandate and opens a gaping hole in the fabric of the remedial scheme. If a hospital were allowed to turn away an individual while she was en route to the hospital under these facts, an uninsured or financially strapped person could be bounced around like a ping-pong ball in search of a willing provider. That result would be antithetic to the core policy on which EMTALA is based.

This sensible construction also preserves the practice of ambulances contacting hospitals prior to arrival when perceived emergencies exist. That practice is salutary because it enables emergency rooms to undertake suitable preparatory measures. Yet, if the crew of an ambulance fears refusal because of, say, the absence of medical insurance, the crew may well decide to approach under cover of silence. Upon arrival, the emergency room would be required to examine and/or treat the individual, but precious time would have been lost.

The Hospital, ably represented, mounts a counter-argument. It laments that our holding—that an individual needing emergency treatment who is en route to the hospital can in certain circumstances be said to have come to the emergency department—is at odds with the decisions of some of our sister circuits. This lamentation is premised on two cases, neither of which is on point.

In the first of these cases, a doctor at one hospital telephoned a second hospital to request emergency care for the plaintiff. *Miller v. Med. Ctr. of Sw. La.*, 22 F.3d 626, 627 (5th Cir.1994). The second hospital declined after determining that the plaintiff had no insurance coverage. *Id.* The court rejected an EMTALA claim against the second hospital on the ground that the plaintiff, at the time of the treatment request, was an in-patient at the first hospital and, thus, could not in any sense be said to have come to the second hospital. *Id.* at 629; *see also id.* at 629 n. 5 (noting that the plaintiff "never even began the journey" to the second hospital). That is a far cry from the case at bar.

The other case hawked by the Hospital is *Johnson.* There, an ambulance contacted a hospital's telemetry system, which redirected it to a different facility. 982 F.2d at 231. The Seventh Circuit rejected a claim that the hospital had violated EMTALA because the ambulance's contact was with the hospital's telemetry system, not with its emergency department. *Id.* at 233 & n. 7. At any rate, the hospital at the time was in "partial bypass" status (an analogue to diversionary status). *Id.* at 231. These facts distinguish *Johnson* from the case at bar.

Last—but surely not least—we reject any suggestion that our holding today is inconsistent with prior decisions of this court. None of our earlier cases dealt with any fact pattern remotely resembling the scenario that is alleged here. *See, e.g., del Carmen Guadalupe v. Negrón Agosto*, 299 F.3d 15, 17–18 (1st Cir.2002); *Reynolds*, 218 F.3d at 79–80; *Correa*, 69 F.3d at 1188–89. While those opinions recognize the presence of the "comes to" language in the statute and acknowledge that this requirement must be satisfied in order to bring EMTALA into play, they stop there; none of them attempt to define that terminology, to delineate its boundaries, or to decipher the significance of the implementing regulations.

At this point, a succinct summary suffices. Presented with an imprecise statute, an unenlightening regulation, and an absence of any clear agency interpretation of what that regulation means, we must rely on the manifest purpose of the statute to interpret the critical statutory phrase. On that basis, and taking the facts and the

reasonable inferences therefrom in the light most hospitable to the plaintiff, we hold that a reasonable factfinder could conclude that the plaintiff had come to the Hospital's emergency department within the purview of EMTALA; that a request for examination or treatment had been tendered on her behalf; and that the request had been rebuffed because of her uninsured status.[6] Consequently, the case is not an appropriate candidate for summary judgment.

## III. CONCLUSION

In conclusion, we add a coda. As matters stand, this is a close and difficult case. Because the statutory phrase admits of different constructions, the agency has the authority, should it choose to act, to resolve the ambiguity either way. To this date, however, HHS has not done so. Unless and until that occurs, we must do the best we can with the interpretive aids that are available.

We need go no further. We reverse the judgment appealed from and remand for further proceedings consistent with this opinion (including reinstatement of the plaintiff's local-law claims).

*Reversed and remanded.*

TORRUELLA, Circuit Judge (Dissenting).

"It is only where the sound of the legislative trumpet is muted or uncertain that judges must interpret—and in interpreting, create. But where the call is a clarion one, the courts have no warrant to rewrite a statute in the guise of 'interpretation.'" *United States v. Charles George Trucking Co.*, 823 F.2d 685, 689 (1st Cir.1987). This is precisely what the majority has done in this case.

While the majority aptly sets forth the correct framework for interpreting a statute, it errs in proceeding beyond the first step—examination of the statutory text itself. It is axiomatic that where the text of a statute is unambiguous, and the ordinary meaning it reveals is not unreasonable, implausible, absurd, or inconsistent with the statutory scheme, then we should give effect to this meaning. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("Our inquiry must cease if the statutory language is unambiguous."); *Mullane v. Chambers*, 333 F.3d 322, 330 (1st Cir.2003); *see also Pritzker v. Yari*, 42 F.3d 53, 67–68 (1st Cir.1994) ("[W]e will not depart from, or otherwise embellish, the language of a statute absent either undeniable textual ambiguity or some other extraordinary consideration, such as the prospect of yielding a patently absurd result ....") (internal citations omitted).

The relevant statutory text reads:
> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) *comes to* the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department....

42 U.S.C. § 1395dd(a) (emphasis added). In an apparent attempt to free itself from this textual straitjacket, the majority follows the lead of the Ninth Circuit in *Arrington v. Wong*, 237 F.3d 1066 (9th Cir. 2001), in positing a dubious ambiguity

---

6. We limit our holding to cases that fairly can be characterized as involving patient "dumping." We take no view as to whether or when a hospital emergency department may have a right to redirect prospective patients for other reasons.

through resort to Webster's dictionary. *See id.* at 1070–71. While I have no quarrel with Webster's affirmation that "to come," in the abstract, can admit of two meanings—to move toward or approach, or to arrive at—we cannot look at this definition in the abstract. Instead, we must read the verb "to come" in the context of the sentence in which it appears, and we cannot simply ignore the verb conjugation chosen by Congress. *See Robinson,* 519 U.S. at 341, 117 S.Ct. 843. The statute speaks of an individual who "comes to the emergency department." The common and ordinary reading of "comes to the emergency department" is "arrives at the emergency department," not "moves toward or approaches the emergency department." *See Williams v. Taylor,* 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) ("We give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import.") (internal quotation marks and citation omitted). To produce the latter connotation, the statute would have to say "is coming to," "comes toward," or some similar construction entailing ongoing action or movement. *See Arrington,* 237 F.3d at 1075 n. 2 (Fernández, J., dissenting) ("For example, if we say that someone has 'come home,' we mean that he has arrived. We do not mean that he is on the way; to express that, we would say that he is 'coming home.'"). The majority contorts the plain meaning of "comes to" by interpreting it as potentially meaning "moves toward or approaches" in this particular sentence, thereby manufacturing an ambiguity that otherwise would not exist.

To me it is clear that "comes to an emergency department" unambiguously means arrives at an emergency depart-

ment.[7] This interpretation, while unfortunate for Morales and others in her position, is neither unreasonable nor implausible. It is also not inconsistent with the statutory scheme or the broader context of the statute as a whole: the statute seeks to combat some instances of patient dumping, including dumping that occurs after an "undesirable" patient shows up at the emergency room doors. While this restriction to physical presence may not have been the wisest one for Congress to write into the statute, it is not our prerogative to substitute our will for that of Congress. As such, our inquiry ends there. *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 254, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000); *United States v. Roberson,* 459 F.3d 39, 51 (1st Cir.2006); *see also In re Cavanaugh,* 306 F.3d 726, 731–32 (9th Cir.2002) ("Congress enacts statutes, not purposes, and courts may not depart from the statutory text because they believe some other arrangement would better serve the legislative goals."). The majority ran afoul of this principle in continuing along on its interpretive odyssey far longer than it should have.

Even if we succumb to the siren's song and join the majority in its scrutiny of the regulation—an exercise I deem unwarranted—the end result is the same. The regulation provides:

> Comes to the emergency department means … the individual … [i]s in a ground or air nonhospital-owned ambulance on hospital property for presentation for examination and treatment for a medical condition at a hospital's dedicated emergency department. However, *an individual in a nonhospital-owned ambulance off hospital property is not*

---

**7.** I state no view on whether "emergency department" in the statute includes the

grounds of the hospital generally because this question is not at issue in this appeal.

*considered to have come to the hospital's emergency department, even if a member of the ambulance staff contacts the hospital by telephone or telemetry communications and informs the hospital that they want to transport the individual to the hospital for examination and treatment.* The hospital may direct the ambulance to another facility if it is in "diversionary status," that is, it does not have the staff or facilities to accept any additional emergency patients. If, however, the ambulance staff disregards the hospital's diversion instructions and transports the individual onto hospital property, the individual is considered to have come to the emergency department.

42 C.F.R. § 489.24(b)(4) (emphasis added). The meaning of the first and second sentences becomes evident simply by reading them: an individual in a non-hospital-owned ambulance has not "come to" the emergency department unless and until she is on hospital property. The second sentence is a manifest expression of HHS's intent to exclude from this category those who merely call ahead. It is apparent that HHS put considerable thought into the rather elaborate formulation of the second sentence. While the majority faults the district court for declaring the third sentence superfluous, the majority effectively does the same for the much more pivotal first and second sentences by rendering the entire regulation a nullity, and proceeding to impose its own, contrary view of what "comes to" means. *See Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (Supreme Court "especially unwilling to [treat a statutory term as surplusage] when the term occupies [a] pivotal ... place in the statutory scheme"). Whatever HHS intended by the third sentence, this sentence should not be read in such a way that it subverts the first two, in which HHS's intent is abundantly clear.

As Judge Fernández posits in *Arrington,* the most plausible reading of the third sentence is that it is simply one scenario— when the hospital is in "diversionary status"—under which the hospital may deny access to an individual in a non-hospital-owned ambulance that calls ahead, and not the only scenario under which it may deny access. *Arrington,* 237 F.3d at 1076 (Fernández, J., dissenting). On this reading, the third sentence is not superfluous at all, but is instead fully compatible with the first two.

The fourth sentence explains what happens if the directive in the third sentence is ignored, and in so doing defines "comes to" in a manner fully consistent with the obvious meaning of that term in the first and second sentences. According to the fourth sentence, if the ambulance staff ignores the hospital's denial of access and shows up on hospital property anyway, then the patient has "come to" the emergency department and the hospital must treat her. 42 C.F.R. § 489.24(b)(4). This sentence plainly evinces HHS's intent that in order to have "come to" the emergency department, the patient must, at the least, be physically on hospital property. This construction of the statute is eminently plausible and demands our deference. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The Hospital was not required to accept Morales into its emergency department under the governing statute or regulation because she never "came to" the emergency department. Since I would accordingly affirm the district court's summary judgment in favor of the Hospital, I respectfully dissent.