Nivia **FRATICELLI–TORRES**, et al., Plaintiffs, Appellants,

v.

**HOSPITAL HERMANOS**, et al., Defendants, Appellees.

No. 07–2397.

United States Court of Appeals, First Circuit.

Nov. 13, 2008.

Appeal from the United States District Court for the District of Puerto Rico, Francisco A. Besosa, U.S. District Judge.

Pedro F. Soler–Muñiz and José R. Ortiz–Velez, on brief for appellants.

Raphael Peña Ramón and Peña Ramón & Co., on brief for appellees.

Before BOUDIN, LIPEZ and HOWARD, Circuit Judges.

PER CURIAM.

Nivia Fraticelli Torres appeals from a district court grant of summary judgment, dismissing her claim under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395 *et seq.*, against the hospital and physicians who treated her decedent spouse for a fatal coronary condition. We affirm.

**A.**

Appellant's husband, Guillermo Bonilla Colon, went to the Hospital Hermanos Melendez's emergency room (ER) on the evening of June 25, 2003, complaining that he had suffered intermittent severe chest pains and arrhythmia over the course of the previous two days. Pursuant to established hospital protocols, ER physicians placed Bonilla on cardiac monitoring, ordered a battery of diagnostic tests, and determined that he likely had suffered a myocardial infarction anywhere from nine hours to two days before coming to the ER. Because ER physicians concluded that the infarction was now passed, however, they did not order any thrombolytic treatment, which involves the injection of drug agents (*e.g.*, streptokinase) to break down blood clots obstructing arterial flow to heart muscle before it incurs further irreparable damage. Defendants admitted Bonilla to the hospital's intensive care unit (ICU) for further observation.

On July 1, defendants performed a cardiac catheterization (*viz.*, the surgical insertion of a thin flexible tube through a blood vessel in the patient's arm or leg which permits doctors comprehensively to evaluate the extent of any heart or blood vessel damage), which confirmed that a recent myocardial infarction had caused extensive and irreparable damage to Bonil-

la's heart muscle, and that Bonilla would need to be transferred to another hospital facility which was capable of performing angioplasty or stent implantation. On July 3, Bonilla began to exhibit symptoms of congestive heart failure (*e.g.*, edema, shortness of breath), a degenerative post-infarction condition which results from the damaged heart's inability to supply sufficient oxygenated blood. Defendants stabilized Bonilla and, with his and appellant's informed consent, transferred him to another hospital to undergo angioplasty or stent implantation. Bonilla remained there until July 14, when he was transferred to yet another hospital to await heart transplant surgery. He died there of congestive heart failure on July 16, 2003.

In June 2004, appellant—on behalf of herself and her minor child—filed suit against the first hospital, its doctors, and its insurer in federal district court, alleging that defendants had violated EMTALA by treating Bonilla disparately from other similarly situated heart-attack victims who came to the hospital's ER. Specifically, appellant alleged that defendants (i) failed to subject Bonilla to an adequate cardiac screening examination in accordance with established hospital protocols; (ii) failed to provide Bonilla with adequate medical treatment for his diagnosed heart condition; (iii) failed immediately to transfer Bonilla to another hospital capable of providing the necessary medical care; and (iv) failed adequately to stabilize Bonilla before his July 3 transfer to another hospital. Plaintiffs' complaint also contained a commonwealth-law claim for medical malpractice.

Following discovery, defendants filed a motion for summary judgment on both counts. The district court granted the motion, finding that appellant had not established a trialworthy EMTALA claim,

and dismissing the state-law malpractice claim without prejudice for lack of supplemental jurisdiction.

## B.

 Appellant first contends that summary judgment was unwarranted because genuine factual disputes persist as to whether defendants subjected Bonilla to disparate treatment under their established screening/stabilization protocols by refusing to give him thrombolytic treatment (*viz.*, blood-clot dissolution therapy) during his ER stay. After screening Bonilla, defendants' ER physician, Dr. Martinez, decided not to begin thrombolysis because (i) an unwritten ER protocol established that only cardiologists or internal medicine specialists—and not ER physicians—were authorized to order thrombolysis; and (ii) thrombolytic treatment was contraindicated for Bonilla because the anti-clotting drug streptokinase is most effective and least risky if administered within the first six hours after the onset of cardiac symptoms, and test results suggested that Bonilla's heart attack likely had occurred—at the very latest—nine hours before his ER admission. On the other hand, appellant proffered the hospital's written ICU protocol, which recommends thrombolysis within twelve hours of the onset of a myocardial infarction.

We review a grant of summary judgment *de novo*, drawing all reasonable inferences from the evidence in the light most favorable to the nonmoving party (*viz.*, appellant) to determine whether there is no genuine issue of material fact and the moving parties (*viz.*, appellees) are entitled to judgment as a matter of law. *Morales v. Sociedad Espanola de Auxilio Mutuo y Beneficencia*, 524 F.3d 54, 56 (1st Cir.), *petition for cert. filed*, 77 U.S.L.W. 3088 (U.S. Aug. 11, 2008) (No. 08–169).

Congress enacted EMTALA to prevent the unsavory practice known as patient "dumping," whereby hospitals precipitously discharged or transferred to other hospitals patients who were unable to pay for their healthcare, in many cases even before the hospital determined whether the patient had a critical medical condition which was likely to deteriorate after discharge or during the inter-hospital transfer. *See Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1189–90 (1st Cir.1995).[1] EMTALA now imposes two core obligations on covered hospitals: "First, 'if any individual ... comes to the emergency department [of a covered hospital] and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination.' Second, if the screening examination discloses that the individual suffers from an emergency medical condition, the hospital must provide necessary stabilization." *Morales*, 524 F.3d at 57–58 (citing 42 U.S.C. § 1395dd(a)). Congress did not intend EMTALA to supplant existing state-law medical malpractice liability with a federal malpractice standard of care; the minimal screening and stabilization requirements were designed solely to pre-

---

1. Appellant also argues that the district court applied the wrong legal standard under the EMTALA, requiring her to adduce evidence that defendants' medical decisions concerning Bonilla were actually motivated by his inability to pay for his healthcare. *See Correa*, 69 F.3d at 1193–94 (rejecting the argument that an EMTALA plaintiff must prove that defendant's motivation was "to shirk the burden of uncompensated care"). The district court's statement that the circumstances of Bonilla's case were "hardly the picture of a hospital dumping or refusing to treat a patient for lack of medical insurance" was prefaced, however, by its observation that defendants did not discharge Bonilla precipitously, but admitted him to the hospital for a week's observation.

vent the specific injury of patient "dumping," which state malpractice law often could not redress. *See Reynolds v. MaineGeneral Health,* 218 F.3d 78, 83–84 (1st Cir.2000).

Given this statutory framework, appellant's contentions fall short. As defendants point out, the hospital's ICU department's written twelve-hour thrombolysis protocol is, by its very terms, not expressly applicable to patients in its ER. Even if it were, moreover, thrombolysis is not a diagnostic tool which would implicate EMTALA's "screening" criterion, but a treatment option for incipient myocardial infarction, and therefore, defendants' threshold decision in the ER not to order thrombolysis for Bonilla would implicate only the "stabilization" criterion. Under EMTALA, the term "stabilize" means "with respect to an emergency medical condition ... [a hospital must] provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from [its] facility." 42 U.S.C. § 1395dd(e)(3)(A). The stabilization obligation does not impose a standard of care prescribing how physicians must treat a critical patient's condition while he remains in the hospital, but merely prescribes a precondition the hospital must satisfy before it may undertake to transfer the patient to another hospital. *See Harry v. Marchant,* 291 F.3d 767, 771–72 (11th Cir.2002) ("Construing EMTALA to mandate stabilization treatment irrespective of a transfer renders the words 'during the transfer,' contained in the statutory definition of the term 'to stabilize,' superfluous. To give effect to the clear language of the statute, we must conclude the triggering mechanism for stabilization treatment under EMTALA is transfer.").

Defendants' decision not to give Bonilla thrombolytic treatment in their ER, whether or not it transgressed any statelaw medical malpractice standard of care, is immaterial for purposes of the EMTALA "stabilization" requirement. Even if that treatment option were appropriate within twelve hours of symptom onset, and Bonilla fit that profile when he came to the ER, defendants neither had nor made any plans to transfer Bonilla to another hospital at that time, and, in fact, they did not do so until a week later, when neither the ER nor the ICU protocol would have mandated, or even recommended, thrombolytic treatment of his condition.

### C.

Appellant next contends that summary judgment was unwarranted because her medical experts attested that Bonilla's myocardial infarction was not a completed event when he presented at defendants' ER, but that he continued to suffer from chest pain (angina) and tachycardia (a heart rate over 100/minute) throughout his one-week hospital stay, and that defendants never took—or unreasonably delayed taking—the steps necessary to "stabilize" his emergency medical condition, such as ordering thrombolytic treatment, a prompt cardiac catheterization, or an earlier inter-hospital transfer to undergo angioplasty. Appellant points out that defendants' duty of stabilization continued even after they transferred Bonilla from the ER to the ICU, *see Lopez–Soto v. Hawayek,* 175 F.3d 170, 173 (1st Cir.1999) (noting that the EMTALA stabilization duty applies "regardless of how that person enters the institution or where within the walls he may be when the hospital identifies the problem"), and therefore up to the time of

his July 3 inter-hospital transfer.[2]

Defendants do not dispute that *Lopez–Soto* stands for the limited proposition that EMTALA's duty-to-stabilize requirement, unlike the threshold duty-to-screen requirement, applies not only while a critical patient remains at hospital's typical point-of-entry (*viz.*, the ER), but continues in force even after the patient's relocation to another hospital department (*e.g.*, the ICU). Both parties also agree that thrombolysis is an appropriate treatment only for a patient who is *presently* undergoing a myocardial infarction (as evidenced, for example, by recurrent chest pain/angina and tachycardia), and like other reperfusion therapies (*e.g.*, angioplasty), thrombolytic treatment attempts to restore the restricted arterial flow of oxygenated blood to the heart muscle *before* that muscle is irreparably damaged. After Bonilla was cardiac-screened at the hospital's ER,[3] defendants concluded—and their conclusions were documented contemporaneously in Bonilla's medical charts—that Bonilla already had suffered a *completed* myocardial infarction (dating back to anywhere from nine hours to two days before Bonilla came to the ER), which already had resulted in permanent damage to his heart muscle, as evidenced by the EKG's acute "Q wave" readings. Because Bonilla was not suffering from recurrent angina or ventricular tachycardia, however, defendants concluded that the myocardial infarction was now passed, and the damage done.

To oppose summary judgment, appellant has adduced her own medical experts' contrary medical opinions that Bonilla's myocardial infarction was not completed even as late as July 3, which they base on conflicting reports that Bonilla did experi-

---

**2.** Appellant also contends that defendants violated EMTALA by failing to obtain Bonilla's prior written consent to his July 3 transfer to another hospital. EMTALA requires written consent only when the patient is unstabilized: "If the patient's condition has not been stabilized, the hospital may not transfer the patient to another medical facility unless (1) the patient or her proxy requests a transfer in writing, or (2) a physician or other medical professional certifies that the medical benefits available at the other facility outweigh the risks of transfer." *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir.2001) (citing 42 U.S.C. § 1395dd(c)(1)). Because defendants believed that Bonilla was "stabilized" at the time of his July 3 transfer, however, *see infra*, they did not need to obtain his consent in writing.

**3.** With one exception, appellant does not dispute that defendants complied with the hospital's mandatory protocols for screening patients with heart attack symptoms (*viz.*, orders for cardiac monitoring and a series of cardiac-profile tests). "A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." *Cruz–Queipo v. Hospital Espanol Auxilio Mutuo de P.R.*, 417 F.3d 67, 70 (1st Cir.2005). Appellant contends, however, that the hospital failed promptly to order one diagnostic test—a cardiac catheterization—and waited until July 3 to perform it. She failed to adduce any evidence, however, that invasive tests like catheterizations—unlike, for example, an EKG—are mandatory screening procedures for all patients presenting cardiac symptoms at the ER, or that Bonilla was denied a catheterization in the ER where other patients with similar symptoms were not. Appellant also points out that defendants alleged that Bonilla refused their initial offer to perform a catheterization, but did not obtain the refusal in writing, as required by hospital's EMTALA "Norms and Procedures" ¶ E. The only type of cardiac catheterization (or angiography) offered by defendants is a diagnostic test, however, not a form of reperfusion treatment. Paragraph E of the hospital's Norms and Procedures specifies that the hospital must obtain "written documentation" and explain any attendant risks and possible complications only "[i]n the event that the patient rejects the treatment."

ence recurrent angina and tachycardia throughout his hospital stay. Appellant urges that her experts' diagnoses of an ongoing myocardial infarction generate a genuine factual dispute whether defendants failed adequately to stabilize Bonilla—by providing him with appropriate treatment for an ongoing myocardial event, such as thrombolysis—before they transferred him to another hospital on July 3, and preclude any summary disposition of her EMTALA claim. Appellant's arguments fail.

For EMTALA purposes, defendants properly initiated an extensive protocol "reasonably calculated to identify critical [heart] conditions," and appellant has not adduced any evidence that defendants disparately treated Bonilla by relying on this protocol and the resulting test results as bases upon which to diagnose his medical condition. *See Del Carmen Guadalupe v. Negron Agosto,* 299 F.3d 15, 19 (1st Cir. 2002) (noting that " '[w]hat EMTALA prohibits is disparate screening or no screening at all' ") (citation omitted); *supra* note 3.

Appellants' experts' contrary medical diagnoses suggest, at the very most, that the inferences which defendants drew from Bonilla's test results might have been faulty or even negligent, but while these matters legitimately might form the grist of appellant's state-law medical malpractice claim, they normally will not trigger EMTALA liability. *See id.* at 21 ("EMTALA does not 'create a cause of action for medical malpractice,' and 'faulty screening, in a particular case . . . does not contravene the statute,' " and "criticisms of [defendant's] diagnosis . . . in the emergency room are indistinguishable from the standard of care criticisms that one would hear from an expert in a malpractice case triggered by a misdiagnosis.") (citations omitted). EMTALA only

imposes a requirement that, before ordering any inter-hospital transfer, hospitals stabilize critical medical conditions of which, after reasonable screening procedures, they become aware. *Reynolds,* 218 F.3d at 85 ("It is doubtful that the text of the statute would support liability under the stabilization provision for a patient who had DVT, absent evidence sufficient to support a finding that the hospital *knew* of his DVT.") (emphasis added; collecting cases); *Thomas v. Christ Hosp. and Med. Ctr.,* 328 F.3d 890, 895 (7th Cir.2003) (noting that summary judgment on EMTALA claim is appropriate where "there was no allegation of 'any facts known to the doctors *at the time* to state that the patient was not stabilized' ") (citation omitted); *Baker v. Adventist Health, Inc.,* 260 F.3d 987, 993 (9th Cir.2001) ("The hospital's duty to stabilize arises only when it actually detects an emergency medical condition."). Notwithstanding appellant's experts' "hindsight" diagnoses, defendants' contemporaneous diagnosis of Bonilla's medical condition is undisputed: they concluded, based on test results and physical examinations, that Bonilla recently had suffered a now-completed myocardial infarction. Based on that contemporaneous diagnosis, thrombolytic therapy was obviously contraindicated.

Even if one could conceive of a hypothetical case in which a defendant's diagnosis was so unfounded or groundless that it reasonably might be interpreted as a ruse intended to conceal its unlawful intent to "dump" a critical patient unable to pay for his healthcare, this record presents no such case. Appellant's experts rely on their conclusion that Bonilla continued to suffer angina recurrently through his one-week hospital stay. *See, e.g., Cruz–Queipo,* 417 F.3d at 71 (finding genuine issue of material fact where patient suffered chest pain). Although Bonilla did continue to complain of chest pain, that pain occurred

only when he was moved or touched, which is inconsistent with angina. Because Bonilla admitted to defendants that he recently had begun lifting weights, doctors diagnosed the pain as costochondritis, or a radiating chest pain due to inflammation of the cartilage connecting the sternum to the ribs. Similarly, test results indicated that Bonilla was suffering from sinoatrial tachycardia (*viz.*, rapid contraction of the atria, or the upper heart chambers), and not from ventricular tachycardia (*viz.*, the lower chambers), and only the latter type of tachycardia is a symptom of an ongoing myocardial infarction. Sinoatrial tachycardia also can be a mechanism by which an already damaged heart attempts to compensate for its diminished functionality, and tests revealed that Bonilla's heart was pumping out oxygenated blood at only a 25–30% ejection fraction. Finally, defendants diagnosed Bonilla's tachycardia as "multifactorial," meaning that it might have had other contributing causes, such as his natural anxiety in the aftermath of a heart attack.

When defendants finally transferred Bonilla to another hospital on July 3 for additional treatment, he was in the initial degenerative stages of congestive heart failure (*e.g.*, edema, shortness of breath, and weakness) caused by the irreparable heart muscle damage he suffered in the earlier heart attack, but defendants concluded that he was "stabilized," *viz.*, "that no material deterioration of the condition is likely to result or occur during the transfer of the individual from a facility," 42 U.S.C. § 1395dd(e)(3)(A), based on test data that he was not in the process of having another myocardial infarction. *See, e.g., Brooker v. Desert Hosp. Corp.*, 947 F.2d 412, 415 (9th Cir.1991) ("A patient may be in a critical condition ... and still be 'stabilized' under the terms of [EMTALA]."). Given this summary judgment record, there exists no genuine dispute of material fact concerning defendants' pretransfer stabilization of Bonilla.

### D.

■ Appellant next argues that summary judgment was not warranted because EMTALA imposes on a hospital which cannot provide necessary treatments (*viz.*, angioplasty or stent implantation) the obligation promptly to transfer the patient to a hospital that can do so, and thus defendants should have ordered Bonilla's transfer one week earlier than they did to receive reperfusion therapy not provided by the hospital.

Unsurprisingly, appellant provides no case support for her contention. By its express terms, EMTALA—which is solely an anti—"dumping" statute—does not impose any positive obligation on a covered hospital to transfer a critical patient under particular circumstances to obtain stabilization at another hospital. Rather, EMTALA merely restricts the conditions under which a hospital may transfer an unstabilized critical patient. For example, if Bonilla had been critical and unstabilized in defendants' ER, EMTALA would have prohibited defendants from transferring Bonilla to another hospital for alternative treatments unless Bonilla or appellant requested such a transfer in writing, or defendants certified that the medical benefits available at the other hospital outweighed the risks of transfer. *See Baker*, 260 F.3d at 993; *supra* note 2. A hospital's negligent medical decision not to transfer a critical patient promptly to another hospital to receive necessary treatment might trigger state-law medical malpractice liability, but it could not constitute an EMTALA anti-dumping violation.

For these reasons, we conclude that the district court properly granted summary judgment for defendants on appellant's EMTALA claim, and determined that the proper venue for appellant to pursue her medical malpractice claim is in the commonwealth courts.

*Affirmed.*