# United States Court of Appeals
## For the First Circuit

No. 08-2351

PROVIDENCIA ALVAREZ-TORRES et al.,

Plaintiffs, Appellants,

v.

RYDER MEMORIAL HOSPITAL, INC. et al.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Francisco Besosa, U.S. District Judge]

Before

Lipez and Howard, Circuit Judges,
and Woodcock, District Judge.[*]

José Luis Ubarri, with whom Brown & Ubarri was on brief, for appellant.
Teresa M. García-Moll for appellee Ryder Memorial Hospital, Inc.
José A. Gonzalez Villamil on brief for appellees Dr. Enrique Octavio Ortiz-Kidd, the conjugal partnership of Dr. Enrique Octavio Ortiz-Kidd and his wife, and Triple-S, Inc.
José Miranda Daleccio on brief for appellee Juan Ramón Gómez López.
Igor Domínguez Pérez on brief for appellee Dr. Griselle Pastrana.
Luis R. Ramos Cartagena on brief for appellee Sindicato de Aseguradores de Impericia Medico Hospitalaria.

September 4, 2009

[*]Of the District of Maine, sitting by designation.

**LIPEZ, Circuit Judge**. The surviving family of Adalberto Martínez López brought suit against a hospital and several physicians, alleging a violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and various provisions of state law. The district court granted the defendants' motion for summary judgment, concluding that plaintiffs had failed to make out a claim under EMTALA and declining to exercise supplemental jurisdiction over the state-law claims.

Plaintiffs appeal, arguing, inter alia, that the evidence supports a claim for failure to stabilize under EMTALA. Finding no error, we affirm.

**I.**

**A. Factual Background**

On appeal from a grant of summary judgment, we state the facts in the light most favorable to the non-movant. Levesque v. Doocy, 560 F.3d 82, 84 (1st Cir. 2009).

At 6:45 p.m., on January 16, 2001, Adalberto Martínez López ("Martínez") came to the Ryder Memorial Hospital, Inc. ("Ryder") Emergency Room complaining of chest pain and bleeding from a femoral dialysis catheter site. Martínez was fifty-seven years old at the time and an end-stage renal disease dialysis patient. His vital signs were taken, and at 6:50 p.m. Martínez was examined by Dr. Griselle Pastrana, an emergency room physician.

Dr. Pastrana documented that Martínez was actively bleeding from the catheter site and that he was weak and dizzy. She described his general condition as "alert, oriented [and] mildly pale," and noted his end-stage renal disease. Dr. Pastrana ordered a variety of tests for Martínez, including a chest x-ray, an EKG, and a "type and cross for four units of Packed Red Blood Cells."

At 7:30 p.m., Dr. Pastrana discussed Martínez's case with Dr. Enrique Ortíz-Kidd, a nephrologist at Ryder. Dr. Ortíz-Kidd then ordered Martínez's admission to Ryder's "Medicine Floor" and the completion of the tests ordered by Dr. Pastrana. Martínez was admitted to the Medicine Floor at 7:39 p.m., with orders for bed rest, testing of vital signs every four hours, and hemodialysis and a blood transfusion the next morning.

Martínez did not arrive in his room on the Medicine Floor until 9:30 p.m. When he arrived, he was described as alert, but pale, feverish, and complaining of chest pain. The catheter site remained bloody. At 10 p.m., the on-duty nephrologist, Dr. Baquero, was contacted and informed of Martínez's vital signs. Dr. Baquero prescribed, among other things, an antibiotic and Tylenol, which were administered at 10:20 p.m. At 12:15 a.m., January 17, Dr. Ortíz-Kidd gave a telephone order to change the bandage on Martínez's catheter site, apply pressure, and prepare for a blood transfusion in the morning.

However, Martínez continued to bleed throughout the night, and his bandages had to be changed several times. At 4:55 a.m., a relative accompanying Martínez complained to the nursing staff that the bleeding was "profuse[]." Staff contacted Dr. Ortíz-Kidd, who requested a consultation with a Ryder surgeon, Dr. Sotomayor. Vital signs taken at 5 a.m. reflected that Martínez's blood pressure had dropped and his temperature had increased. Nurses called an on-duty physician, Dr. Juan R. Gómez López, who examined Martínez and ordered a blood transfusion. He then discussed Martínez's condition with Dr. Ortíz-Kidd over the phone.

At 5:30 a.m., staff contacted Dr. Ortíz-Kidd again and informed him that Dr. Sotomayor was not available. Dr. Ortíz-Kidd requested that Dr. Luis Canetti, another Ryder surgeon, evaluate the patient. Nurses noted that when Dr. Cannetti removed the bandages to examine Martínez, "bleeding continue[d] profusely and abundantly." Dr. Canetti determined that Martínez required surgery but that he could not perform it, and he recommended that Martínez be immediately transferred to Auxilio Mutuo Hospital for an "A-V fistula revision." At 7 a.m., Dr. Ortíz-Kidd was notified of the recommendation and "order[ed] [the] patient to be transferred as soon as possible." The blood transfusion ordered by Dr. Gómez López began at 7:05 a.m.

-4-

Sometime between 7 and 8 a.m., nurses discovered that Martínez was not breathing. CPR was performed, but Martínez could not be revived. He was pronounced dead at 8:15 a.m., January 17, 2001.

## B. Proceedings in the District Court

On January 15, 2003, Martínez's surviving wife and children, including Tony Martínez Taveras, a child from another relationship, brought suit against Ryder, Dr. Pastrana, Dr. Ortíz-Kidd, and an unnamed physician. The Second Amended Complaint, which also named as defendants Dr. Gómez López and Dr. Cannetti, alleged violations of EMTALA by Ryder; malpractice by Drs. Pastrana, Ortíz-Kidd, Gómez López, and Cannetti; and several other state-law claims.[1]

After defendants' motions to dismiss were, for the most part,[2] denied, a long and contentious period of discovery ensued. At its completion, the district court granted defendants' motion for summary judgment on November 19, 2007, on all of plaintiffs' claims, concluding that the plaintiffs had failed to establish a claim under EMTALA against Ryder for failure to screen or stabilize

_____

[1]  Also named as defendants in the Second Amended Complaint were the insurers and "conjugal partnerships" of Drs. Pastrana, Ortíz-Kidd, Gómez López, and Cannetti. Because these defendants are not material to the issues presented on appeal, we omit reference to them below.

[2]  The district court dismissed claims against one of the defendant insurers on the grounds that insurance coverage did not extend to the alleged incident.

-5-

and that EMTALA did not support claims against the individual physicians who had treated Martínez. It declined to exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c)(3).

Plaintiffs timely appealed. On appeal, they argue that the district court erred in dismissing the EMTALA claim for failure to stabilize, that no EMTALA claims were brought against individual physicians, and that the district court retained jurisdiction over state-law claims brought by Tony Martínez Taveras on the basis of diversity jurisdiction.

**II.**

## A. EMTALA claims against Ryder

EMTALA is designed to prevent hospital emergency rooms from "refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance." Correa v. Hosp. San Francisco, 69 F.3d 1189, 1189 (1st Cir. 1995) (internal quotation marks and citation omitted). To this end, EMTALA imposes duties on covered facilities to: (a) provide an "appropriate medical screening examination" for those who come to an emergency room seeking treatment, and (b) provide, in certain situations, "such further medical examination and such treatment as may be required to stabilize the medical condition." 42 U.S.C. § 1395dd(a), (b)(1)(A); see López-Soto v. Hawayek, 175 F.3d 170, 172-73 (1st Cir. 1999).

To establish a violation of the screening or stabilization provisions in EMTALA, a plaintiff must prove that:

> (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition.

Correa, 69 F.3d at 1190.

In this case, the district court determined that plaintiffs had failed to establish a violation of either the screening or stabilization provisions. Plaintiffs appeal only the stabilization ruling. They argue that, properly construed, EMTALA "imposes an unqualified duty to stabilize once it is determined that the patient has an emergency medical condition," and this duty begins upon admission to the hospital and follows the patient to any hospital department. They suggest that Ryder violated this duty by failing to dispense any meaningful treatment to stabilize Martínez's condition until it became apparent that he was about to die. In the alternative, plaintiffs argue that even if the duty to stabilize applies only when a patient is transferred, "transfer" does not require a patient to physically leave the hospital, but only for a physician to enter an order of transfer. Any other interpretation, plaintiffs say, would undermine the purpose of

-7-

EMTALA. Thus, on plaintiffs' view, Dr. Ortíz-Kidd triggered the stabilization duty by entering an order of transfer for Martínez.

We agree with the district court that plaintiffs have failed to establish a violation of the EMTALA stabilization provision. The duty to stabilize under EMTALA "does not impose a standard of care prescribing how physicians must treat a critical patient's condition while he remains in the hospital, but merely prescribes a precondition the hospital must satisfy before it may undertake to transfer the patient." Fraticelli-Torres v. Hosp. Hermanos, 300 Fed. Appx. 1, 4 (1st Cir. 2008) (unpublished). Thus, a hospital cannot violate the duty to stabilize unless it transfers a patient, as that procedure is defined in EMTALA. See Correa, 69 F.3d at 1190 (to establish a violation of the duty to stabilize, the plaintiff must prove, inter alia, that the hospital "bade farewell" to the patient).

As the Eleventh Circuit has explained, this conclusion follows from the statutory definition of "to stabilize." Harry v. Marchant, 291 F.3d 767, 770-72 (11th Cir. 2002) (en banc). The stabilization provision requires a covered hospital, within its staff and facilities, to provide an individual it determines has an emergency medical condition with "such further medical examination and such treatment as may be required to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1)(A). EMTALA defines "to stabilize" as "to provide such medical treatment of the condition

as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur <u>during the transfer of the individual from a facility</u>." <u>Id.</u> § 1395dd(e)(3)(A) (emphasis added). When this definition is inserted, the stabilization provision requires "such further medical examination and such treatment as may be required [to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility]." <u>Id.</u> § 1395dd(b)(1). This directive plainly applies only where transfer occurs. Otherwise, no effect is given to the phrase "during the transfer." <u>Harry</u>, 291 F.3d at 771-72.[3]

Contrary to plaintiffs' suggestion, this interpretation does not undermine the purposes of EMTALA by permitting hospitals and physicians to provide substandard treatment. EMTALA is a "limited 'anti-dumping' statute, not a federal malpractice statute." <u>Bryan</u> v. <u>Rectors & Visitors of the Univ. of Va.</u>, 95 F.3d 349, 351 (4th Cir. 1996); <u>accord</u> <u>Harry</u>, 291 F.3d at 770. Congress's concern with patient dumping is clearly implicated when

---

[3] Such an interpretation also makes sense of the larger structure of the stabilization provision, which "set[s] forth two options for transferring a patient with an emergency medical condition": stabilizing the condition or transferring without stabilizing where an exception applies. <u>Harry</u>, 291 F.3d at 771; <u>see</u> 42 U.S.C. § 1395dd(b)(1).

a hospital transfers a patient. Harry, 291 F.3d at 773 ("The primary legislative goal of EMTALA was remedying the problem of inappropriate patient transfers by hospitals." (citing S. Rep. No. 99-146, at 469-70 (1986), reprinted in 1986 U.S.C.C.A.N. 42, 428-29)). Interpreting the stabilization provision to apply where transfer occurs is therefore fully consistent with EMTALA's statutory purpose.

In this case, Ryder did not violate the stabilization provision because Martínez was never transferred. The statute defines "transfer" as "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital." 42 U.S.C. § 1395dd(e)(4). Therefore, Dr. Ortíz-Kidd's order that Martínez was "to be transferred as soon as possible" did not effectuate a "transfer" for purposes of EMTALA. The summary judgment record clearly establishes that Martínez never left Ryder's facilities, and indeed died in the room on the Medicine Floor where he was admitted the night of January 16. Because no transfer occurred, plaintiffs have not established a stabilization claim under EMTALA.

The reasoning of Morales v. Sociedad Española de Auxilio Mutuo y Beneficiencia, 524 F.3d 54 (1st Cir. 2008), does not aid plaintiffs. In Morales, we held that where an individual is en route to a hospital in an ambulance, and the paramedics contact the

hospital and discuss the individual's ability to pay, the individual has "come[] to" the hospital emergency department for purposes of triggering EMTALA's screening requirement. Id. at 60 (alteration in original). EMTALA did not define "comes to," and the implementing regulations were ambiguous with regards to individuals en route to a hospital in an ambulance. Id. at 58, 60. "Given the imprecision of the statute and the regulation and the absence of reliable guidance from the agency," we interpreted "comes to" in a way that prevented hospitals from undermining EMTALA's statutory intent. Id. at 60-61. In this case, EMTALA does define the critical expression, "to stabilize." That definition clearly shows that the duty to stabilize attaches when a hospital transfers a patient. Moreover, this interpretation is fully in keeping with the statutory intent, since transfer is where the danger of patient dumping often arises. Plaintiffs' view of EMTALA, in contrast, would go beyond the statutory intent and create a duty of care for medical services provided while a patient remains in the hospital.

## B. EMTALA Claims Against the Physicians

In its Summary Judgment order, the district court stated that "[p]laintiffs bring their EMTALA claims not only against Ryder but also against individual physicians." The court then dismissed these claims on the grounds that "EMTALA applies only to participating hospitals." On appeal, plaintiffs argue that the

-11-

court wrongly characterized their claims against the physicians who treated Martínez, and suggest that these claims are based on Puerto Rico law.

We agree that plaintiffs' claims against Drs. Pastrana, Ortíz-Kidd, Gómez López, and Cannetti, as reflected in the Second Amended Complaint, are based, at least in part, on Puerto Rico law. Nevertheless, the district court also dismissed without prejudice "plaintiffs' state law claims against defendants," which plainly includes state-law claims against the individual physicians. The district court was entitled to do this. 28 U.S.C. § 1367(c)(3) (permitting district court to decline to exercise supplemental jurisdiction where it has "dismissed all claims over which it has original jurisdiction").

## C. Claims brought by Tony Martínez Taveras

Lastly, plaintiffs argue that the district court erred in dismissing state-law claims brought by plaintiff Tony Martínez Taveras, since there was an alternative basis of jurisdiction over those claims. Because Martínez Taveras is a citizen of Germany, plaintiffs argue, the district court has diversity jurisdiction over his state-law claims against defendants.

We note that plaintiffs did not move to amend the Second Amended Complaint to reflect a claim of diversity jurisdiction, as is preferable. See 28 U.S.C. § 1653; Com. of Mass. v. U.S. Veterans Admin., 541 F.2d 119, 122 (1st Cir. 1976). However,

-12-

plaintiffs did raise the issue below in a proposed Pretrial Order submitted to the district court, and the defendants had an opportunity to respond to plaintiffs' claim. Because we can easily resolve plaintiffs' argument, we need not decide whether they properly raised the alternative basis of jurisdiction on appeal. See Futura Dev. of P.R. v. Estado Libre Asociado de P.R., 144 F.3d 7, 12 n.4 (1st Cir. 1998).

Where it applies, diversity jurisdiction requires "complete diversity of citizenship as between all plaintiffs and all defendants." Connectu LLC v. Zuckerberg, 522 F.3d 82, 91 (1st Cir. 2008); Gabriel v. Preble, 396 F.3d 10, 13 (1st Cir. 2005). This means that diversity jurisdiction does not exist where any plaintiff is a citizen of the same state as any defendant. Díaz-Rodríguez v. Pep Boys Corp., 410 F.3d 56, 58 (1st Cir. 2005); see Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267 (1806), overruled on other grounds, Louisville, Cincinnati & Charleston R.R. Co. v. Letson, 43 U.S. (2 How.) 497, 554-55 (1844). According to the Second Amended Complaint, several of the plaintiffs and the defendants are citizens of Puerto Rico. See 28 U.S.C. § 1332(e) (defining "States" in the diversity jurisdiction statute to include the Commonwealth of Puerto Rico). Therefore, no diversity jurisdiction exists.

Affirmed.