# United States Court of Appeals
## For the First Circuit

No. 11-2297

HAZEL I. CRUZ-VÁZQUEZ; RAÚL A. CRUZ-RIVERA; LUCY I.
VÁZQUEZ-RIVERA; CONJUGAL PARTNERSHIP CRUZ-VÁZQUEZ;
BENJAMÍN MARTÍNEZ-REYES; BENJAMÍN MARTÍNEZ-MORALES;
NITZA I. REYES; CONJUGAL PARTNERSHIP MARTÍNEZ-REYES,

Plaintiffs, Appellants,

v.

MENNONITE GENERAL HOSPITAL, INC.; DR. BRENDA M. TORRES-PÉREZ;
JOHN DOE; CONJUGAL PARTNERSHIP DOE-TORRES; DR. EDUARDO GÓMEZ-
TORRES; JANE DOE; CONJUGAL PARTNERSHIP DOE-GÓMEZ; ADVANCED
OB-GYN, PCS; SIMED; COMPANIES A-Z; PETER POE; MARY MOE,

Defendants, Appellees,

MINERVA DÍAZ-ARISTUD; CONJUGAL PARTNERSHIP GÓMEZ-DÍAZ,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Lipez and Howard,
Circuit Judges.

Pedro F. Soler-Muñiz for appellants.
Anselmo Irizarry-Irizarry, with whom Matta & Matta, PSC, was
on brief for appellees.

May 29, 2013

**TORRUELLA, Circuit Judge.** This appeal concerns whether the district court erred in dismissing a disparate screening claim under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. After carefully reviewing the record, we vacate the district court's dismissal and remand for further proceedings.

## I. Background

### A. Factual Background

#### 1. Cruz-Vázquez's Medical Treatment

At around 10:15 p.m. on January 4, 2007, Plaintiff-Appellant Hazel Cruz-Vázquez ("Cruz-Vázquez"), then in her third trimester of her first pregnancy, arrived at the emergency room of Defendant-Appellee Mennonite General Hospital ("Mennonite") requesting medical services. She complained of vaginal discharge and blood spotting but denied experiencing pelvic pain, dysuria or feverishness. Cruz-Vázquez also felt fetal movement upon her arrival to the emergency room. She was evaluated by the on-duty emergency physician, Dr. Brenda M. Torres-Pérez ("Dr. Torres"), who performed a pelvic exam and found that Cruz-Vázquez's cervix was not dilated. No other exams were performed.

At around 10:55 p.m., Dr. Torres called Cruz-Vázquez's obstetrician, Dr. Eduardo Gómez-Torres ("Dr. Gómez"), who advised Dr. Torres to administer 0.25mg of Bretine and 50mg of Visatryl, to discharge Cruz-Vázquez in stable condition, and to instruct her to

follow up at his private office the following morning at 8:00 a.m. Dr. Torres followed those instructions. Cruz-Vázquez was discharged and sent home on January 5, 2007, at 12:15 a.m., less than two hours after her arrival. Cruz-Vázquez's condition was recorded in the medical record as "discharge condition stable."

Cruz-Vázquez was seen the following morning at 8:14 a.m. by Dr. Gómez in his private office. She complained of continued blood spotting but no pelvic pain. Dr. Gómez performed a pelvic exam which revealed a blood collection pool in her vagina and cervix dilation of seven centimeters. Cruz-Vázquez's fetus was floating in breech position. Dr. Gómez diagnosed Cruz-Vázquez as suffering from an incompetent cervix, and he recommended that she be transferred to another hospital.[1] Cruz-Vázquez agreed, and she was transferred in stable condition.

Following admission to the San Juan City Hospital that morning, Cruz-Vázquez underwent a cesarean section. Her baby was born a living baby girl at 12:12 p.m. The baby died on January 7, 2007, at 7:57 a.m., due to unspecified reasons.

### 2. Mennonite's Hospital Protocol

At the time of these facts, Mennonite had in place, and in full force and effect in all of its facilities, a "Gravid with

---

[1] It is uncontested that incompetent cervix is a diagnosis given to patients who have had two or more pregnancy losses in the second trimester of pregnancy. When a patient suffers from an incompetent cervix, her cervix is unable to retain a pregnancy in the absence of contractions or labor.

-3-

3rd Trimester Bleeding" protocol (the "Protocol") which required that a number of tests and examinations be performed on a patient presenting bleeding in her third trimester of pregnancy. The Protocol indicated, for example, that a speculum exam and examination for a rupture of membranes be performed, and that a number of laboratory tests be conducted.[2]

Mennonite has stipulated that the Protocol was in place when Cruz-Vázquez was examined on January 4, 2007, and that it failed to activate or follow that Protocol in her case, including its requirement that certain tests and laboratory studies be

_____

[2] Mennonite's Protocol listed the following screening procedures for patients presenting vaginal bleeding in their third trimester:

1. 3rd trimester bleeding must be differentiated from bloody show by speculum exam;
2. The most likely diagnosis of 3rd trimester bleeding is placenta previa or abruption;
3. The gestational age must be determined;
4. Look for rupture of membranes;
5. Fetal movements;
6. Fetal heart rate tomes by Doppler must be measured;
7. Vital signs as blood pressure, pulse and temperature must be acquired;
8. The following laboratories must be practiced:
    a. CBC
    b. Urinalisys
    c. Serology
    d. PT, PTT
    e. Platelet count
    f. T & Screen or cross match
    g. Serum fibrinogen, fibrin split product of
    hemorrhage only if > B/P (preeclampsia, eclampsia).
9. Open a vein with a catheter;
10. Start ringer Lactate at 125 cc/hr;
11. Send patient to LR in stretcher.

performed on patients presenting vaginal bleeding in their third trimester.

## B. Procedural History

Cruz-Vázquez[3] filed a complaint in the United States District Court for the District of Puerto Rico alleging that she arrived at the emergency department of Mennonite on January 4, 2007, with an emergency medical condition as defined by EMTALA, 42 U.S.C. § 1395dd(e)(1); that Mennonite failed to screen her appropriately, as required under 42 U.S.C. § 1395dd(a); and that Mennonite failed to stabilize or properly transfer her before release on January 5, 2007, thus violating the requirements of 42 U.S.C. § 1395dd(b).

This case has followed a tortured history subsequent to that filing. In March 2009, over a year after the original complaint was filed, Cruz-Vázquez's case proceeded to trial. The trial was truncated by the dismissal of Cruz-Vázquez's expert, Dr. Carlos Ramírez, on the trial's fourth day, following Mennonite's oral <u>Daubert</u> challenge and an evidentiary hearing. <u>See</u> <u>Daubert</u> v. <u>Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 592-93 (1993). After granting Mennonite's motion to exclude Dr. Ramírez's expert testimony, the district court went on to grant Mennonite's Rule 50

---

[3] Cruz-Vázquez brings this case on behalf of herself, her husband, her parents, her deceased child, and in representation of the conjugal partnership formed between herself and her husband. For simplicity, we address all plaintiffs collectively as "Cruz-Vázquez."

motion for judgment as a matter of law; the court held that plaintiffs failed to offer proof of crucial elements of their case. See Cruz-Vázquez v. Mennonite Gen. Hosp., Inc., 613 F. Supp. 2d 202 (D.P.R. 2009).

Cruz-Vázquez appealed to this court, and at oral argument, the issue of subject matter jurisdiction was raised. Specifically, the undersigned inquired whether, under the facts as stated in the amended complaint, the district court could properly exercise federal jurisdiction under EMTALA. Following our request for supplemental briefing on jurisdiction, we issued an opinion vacating the district court's judgment and remanding for further proceedings. Specifically, we found that the district court had abused its discretion when it excluded the expert testimony because its "reasoning had nothing to do with the scientific validity of the opinion that Dr. Ramírez proposed to offer or the principles that underlie it." Cruz-Vázquez v. Mennonite Gen. Hosp., 613 F.3d 54, 59 (1st Cir. 2010). Rather, we found, the district court assessed the expert's potential bias, "a task that is 'properly left to the jury.'" Id. (quoting United States v. Carbone, 798 F.2d 21, 25 (1st Cir. 1986)). Our opinion did not address the jurisdictional issue.

In light of the advanced stage of the proceedings below, the natural progression on remand should have been for the case to proceed to a new trial. However, shortly after the case was

remanded, Mennonite filed a motion for summary judgment "for lack of federal jurisdiction under EMTALA." The district court denied Mennonite's motion, finding that "Mennonite had a standard screening procedure, its 'Gravid with 3rd Trimester Bleeding' protocol, which required certain tests to be performed and which Mennonite denied to Cruz." Cruz-Vázquez v. Mennonite Gen. Hosp., Inc., No. 08-1236 (JP), 2011 WL 3607669, at *7 (D.P.R. Aug. 15, 2011). The court concluded that Plaintiffs "have presented sufficient evidence for a reasonable jury to conclude that Defendants' conduct in failing to apply its 'Gravid with 3rd Trimester Bleeding' protocol to Cruz violated EMTALA." Id.

On the same day summary judgment was denied, Cruz-Vázquez filed a motion to appoint a new expert, Dr. Frederick González. On the following day, the district court granted that motion, ordering that the expert be available to the parties within ten days. The district court also set a date for the jury trial. However, despite the fact that the district court in a prior motion had already considered and rejected the jurisdiction challenge, and that our opinion had been silent as to the issue, which could only be reasonably interpreted to mean that we found no jurisdiction flaw, the district court requested additional briefing "on the issue of jurisdiction within 10 days." Mennonite took advantage of the newly afforded chance to raise the jurisdictional issue and filed a motion to dismiss "for lack of federal jurisdiction under

-7-

EMTALA." Mennonite's briefing, while framed in name as a motion to dismiss on jurisdictional grounds, attacked the merits of Cruz-Vázquez's EMTALA claim, arguing that she had failed to allege sufficient facts to state an EMTALA claim.

The district court granted Mennonite's motion and vacated its prior order denying summary judgment. In its opinion, the court labeled Mennonite's motion as a "motion to dismiss for lack of jurisdiction," but proceeded to address Cruz-Vázquez's EMTALA claim on its merits. It found that Dr. Torres' "decision not to perform additional tests [on Cruz-Vázquez was] not the same as the denial of screening or egregious delay in screening identified by the First Circuit in Correa [v. Hosp. San Francisco, 69 F.3d 1184, 1189 (1st Cir. 1995)]," relying on a Fourth Circuit case to hold that plaintiffs' claims were as to a "faulty" screening rather than a "disparate" screening. Cruz-Vázquez v. Mennonite Gen. Hosp., Inc., No. 08-1236 (JAF/JP), 2011 WL 4381888, at *3 (D.P.R. Sept. 20, 2011) (citing Vickers v. Nash Gen. Hosp., 78 F.3d 139, 144 (4th Cir. 1996)). It proceeded to dismiss Cruz-Vázquez's complaint as stating facts limited to a medical malpractice claim, and holding that "EMTALA does not create a federal cause of action for medical malpractice." Id.

## II. Discussion

### A. Cruz-Vázquez's EMTALA Claim

We first address the procedural and briefing peculiarities we have inherited on appeal. The district court requested that the parties brief "the issue of EMTALA jurisdiction" well after a four-day trial on the merits, a first appeal vacating the granting of Mennonite's Rule 50 motion, and all deadlines for filing dispositive motions. Cruz-Vázquez v. Mennonite Gen. Hosp., No. 08-1236 (JP) (D.P.R. July 9, 2008) (setting deadline for dispositive motions for January 12, 2009). However, while we do not consider whether Mennonite's motion to dismiss was timely filed, the motion nevertheless constitutes an almost unprecedented attempt to revisit pleading issues at the latest possible stage.

Further, the proceedings below appear to confound jurisdictional with merits-based issues. While the district court requested briefing on jurisdictional issues and framed its dismissal on those grounds, the legal assessment of Cruz-Vázquez's EMTALA claim by both the parties and the court focused on whether her complaint, along with facts stipulated outside the pleadings, were sufficient to establish a claim. Specifically, the parties and the district court assessed whether the screening performed on Cruz-Vázquez when she presented at Mennonite's emergency room -- and the medical judgment rendered pursuant thereto -- were adequate to the requirements of EMTALA, rendering her allegations pertaining

to that screening insufficient on the merits. Thus, the district court's opinion and order were erroneous in using a jurisdictional framework to assess the merits of Cruz-Vázquez's EMTALA claim.

We do not continue that path. We review Mennonite's motion to dismiss as substantively raising challenges to the complaint's sufficiency pursuant to Fed. R. Civ. P. 12(b)(6), rather than challenging the district court's federal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).[4] However, in light of the district court's review of materials outside the pleadings,[5] we understand Mennonite's motion to dismiss as having been converted to a motion for summary judgment pursuant to Fed. R. Civ. P. 12(d). Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993); see Fed. R. Civ. P. 12(d). We accordingly review de novo the district court's ruling by analyzing the full record below and in the light most hospitable to the non-moving party. Euromodas, Inc. v. Zanella, Ltd., 368 F.3d 11, 16-17 (1st Cir. 2004). To prevent summary

---

[4] Both parties in fact frame Cruz-Vázquez's challenge on appeal as one from "the erroneous granting . . . of a summary judgment motion for lack of federal jurisdiction." This further supports our treatment of the appeal as one from summary judgment.

[5] Specifically, the district court referred in its opinion to Stipulations of Fact agreed upon by the parties in their Initial Scheduling Conference Order and to the Statement of Uncontested Material Facts, which relates relevant information from Cruz-Vázquez's medical record at Mennonite's emergency room on January 4 and 5, 2007. The district court also referred to the transcript of defendants' deposition of Cruz-Vázquez's expert, Dr. Carlos Ramírez, in which he discussed relevant facts as to Cruz-Vázquez's condition as well as the treatment by Drs. Torres and Gómez.

judgment, "the evidence upon which the nonmovant relies to create a genuine issue of material fact must be 'significantly probative,' not merely colorable." Id. at 17 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)). After such conversion, "the party to whom the motion is directed can shut down the machinery only by showing that a trialworthy issue exists." Collier v. City of Chicopee, 158 F.3d 601, 604 (1st Cir. 1998) (quoting McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)).[6] In this case, the authentic dispute presented is whether Cruz-Vázquez was adequately screened under EMTALA's requirements.

To establish an EMTALA violation, a plaintiff must show (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department; (2) the plaintiff arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) released the patient without first stabilizing the emergency

_____

[6] Both parties had ample notice of any conversion as they had just prepared and submitted summary judgment materials for the district court's review and cited to information drawn from those materials in their motion to dismiss briefing. See Collier v. City of Chicopee, 158 F.3d 601, 603 (1st Cir. 1998) ("A party is 'fairly appraised' that the court will in fact be [applying the summary judgment standard] if that party submits matters outside the pleadings to the judge and invites consideration of them.") (quoting Cunningham v. Rothery, 143 F.3d 546, 549 (9th Cir. 1998)).

-11-

medical condition.[7]  Correa, 69 F.3d at 1190 (citations omitted).

For an EMTALA screening violation, a plaintiff "need not prove that she actually suffered from an emergency medical condition when she first came through the portals of the defendant's facility; the failure appropriately to screen, by itself, is sufficient to ground liability as long as the other elements of the cause of action are met."  Id.

EMTALA does not define what an appropriate medical screening consists of, but we have defined a participating hospital's duty as providing an examination "reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints.  The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly."  Id. at 1192 (internal citations omitted).  In clarifying the screening requirement, we have said that "a refusal to follow regular screening procedures in a particular instance contravenes the statute, but faulty screening, in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute."  Id. at 1192-93 (internal citation

---

[7]  Mennonite has stipulated to the first two elements of Cruz-Vázquez's EMTALA claim: that it is a participating hospital covered by EMTALA and that Cruz-Vázquez arrived at their facility seeking treatment.

omitted).  As a general matter, "[w]hen a hospital prescribes internal procedures for a screening examination, those internal procedures 'set the parameters for an appropriate screening.'" Cruz-Queipo v. Hosp. Español Auxilio Mutuo de P.R., 417 F.3d 67, 70 (1st Cir. 2005) (quoting Correa, 69 F.3d at 1192).

Whether a hospital's existing screening protocol was followed in a circumstance where triggering symptoms were identified by hospital emergency room staff is thus a touchstone in gauging uniform treatment.  Id. at 71; Battle v. Memorial Hosp., 228 F.3d 544, 558 (5th Cir. 2000) ("Evidence that a hospital did not follow its own screening procedures can support a finding of EMTALA liability for disparate treatment."); Summers v. Baptist Medical Ctr. Arkadelphia, 91 F.3d 1132, 1138 (8th Cir. 1996) ("Patients are entitled under EMTALA . . . to be treated as other similarly situated patients are treated, within the hospital's capabilities.  It is up to the hospital itself to determine what its screening procedures will be.  Having done so, it must apply them alike to all patients.").

Circumstances where a screening protocol was not followed when triggering symptoms were identified have been distinguished, for the purposes of EMTALA coverage, from situations where: (1) no screening protocol existed, see, e.g., Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 858-59 (4th Cir. 1994); (2) standard screening procedures existed but were not followed because no identifiable

-13-

triggering symptoms were presented, see, e.g., Vickers, 78 F.3d at 144; and (3) standard screening procedures were in fact followed when identifiable triggering symptoms were presented but an improper diagnosis resulted, see, e.g., Reynolds v. MaineGeneral Health, 218 F.3d 78 (1st Cir. 2000).  Both parties stipulate that a relevant screening protocol existed for female patients presenting vaginal bleeding in their third trimester, and that Mennonite "failed to activate [its] 'Gravid with 3rd Trimester Bleeding' Protocol in this case."  We thus focus on the district court's failure to see how our case law has distinguished allegations regarding a hospital's refusal to follow a regular screening protocol -- as it undisputedly did in this case -- from the second and third set of allegations, namely, that a screening protocol was not followed because no identified symptoms triggered it or that a screening protocol was followed but resulted in an improper diagnosis.

In ordering the dismissal of Cruz-Vázquez's complaint, the district court held that the alleged facts did not support the federal claim for failure to screen under EMTALA.  Specifically, it found that

> Dr. Torres made a medical judgment not to perform additional tests after performing a pelvic examination on Cruz, establishing that she was not experiencing any pain, and consulting Cruz's private physician.  Dr. Torres' decision not to perform additional tests is not the same as the denial of

-14-

> screening or egregious delay in screening
> identified by the First Circuit in <u>Correa</u>.

The district court cited to our decision in <u>Reynolds</u>, 218 F.3d at 83-84, and the Fourth Circuit <u>Vickers</u> decision, 78 F.3d at 144, to support its conclusion that a physician's medical judgment may properly substitute for the implementation of the hospital's internal protocols for the purposes of meeting the appropriate medical screening requirements of EMTALA.

In <u>Reynolds</u>, plaintiff's husband was an emergency room patient who was screened and examined for leg and foot fractures following a car accident and was released after two surgeries. 218 F.3d at 79-81. Subsequent to his release, Reynolds died from pulmonary embolism caused by deep veinous thrombosis ("DVT"), a form of blood clotting or hypercoagulation. <u>Id.</u> at 80. The district court granted the defendant hospital's motion for summary judgment, concluding that the facts did not support a federal claim for failure to screen under EMTALA. <u>Id.</u> We affirmed on two grounds. <u>Id.</u> at 81-82. First, we found that the patient was not experiencing, nor did he complain of, any physiological symptoms that would trigger standard procedures specific to DVT. <u>Id.</u> at 82. Second, the only standard screening policy cited by plaintiff was a general written policy requiring the taking of all presenting patients' "complete histories." <u>Id.</u> at 83-84. Plaintiff supplemented the evidence of the general written policy with expert testimony supporting the proposition that a "complete history"

-15-

necessarily included asking questions about any family history of hypercoagulability in Reynolds' case. Id. at 84. However, upon arrival at the defendant hospital, Reynolds received extensive screening and treatment for all identified injuries: he was treated by a triage nurse, was examined by an emergency room physician who took an oral medical history and ordered a series of laboratory tests, x-rays, and an abdominal CT scan. Id. at 79-82. He was further evaluated by two consulting doctors (a general surgeon and an orthopedic surgeon), had two surgeries, was constantly monitored during his stay and received physical therapy. Id.

This case is distinguishable from Reynolds. The court in Reynolds found that the expert testimony presented regarding emergency staff inquiries into family history, in conjunction with the absence of any more detailed hospital policies, was not sufficient "to support a finding that Mr. Reynolds received materially different screening than did other patients in his condition," and, further, that it was insufficient to support a finding that "Mr. Reynolds was 'symptomatic' for" DVT so as to warrant a screening for that condition. Id. at 84. In this case, however, the hospital's policy was not vague and did not require expert determinations as to its scope as an abstract matter. Rather, it very straightforwardly set forth a series of testing requirements in its "Gravid with 3rd Trimester Bleeding" protocol for all patients presenting a specific set of symptoms. Further,

-16-

Cruz-Vázquez presented and Mennonite conceded that, unlike Reynolds, she was identified by emergency physicians to have the requisite symptoms to trigger the Protocol: vaginal bleeding in her third trimester. Her evidence includes the fact that her examining physician, Dr. Torres, noted her vaginal bleeding on her medical record. Mennonite has further stipulated to the fact that it did not implement its uniform protocol to Cruz-Vázquez. This is sufficient to meet Cruz-Vázquez's factual burden to survive summary judgment on her disparate screening claim.

This case is also distinguishable from Vickers. In Vickers, the Fourth Circuit affirmed a district court's dismissal of a disparate screening claim brought by the executor of a deceased former patient. 78 F.3d at 141. Vickers arrived at the defendant hospital's emergency room after being involved in an altercation in which he fell and landed on his head. Id. Upon arrival, he was extensively examined and diagnosed as suffering from a "laceration and contusions and multiple substance abuse." Id. (quotation marks omitted). After hospital staff repaired Vicker's lacerations with staple sutures, ordered X-rays of his cervical spine, and determined that there was no spinal damage, Vickers was discharged. Id. Four days later, Vickers was found dead, and an autopsy identified the cause of death as "cerebral herniation and epidural hematoma produced by a fracture of the left parietal area of Vickers' skull." Id.

Plaintiff argued that Vickers had "received less screening, both in quantity and quality, than required under the Act, and less than those other patients presenting in this same medical condition received." Id. at 143. However, upon examining the allegations, the Fourth Circuit found them to "ultimately present conventional charges of misdiagnosis," id., stating that "EMTALA is implicated only when individuals who are perceived to have the same medical condition receive disparate treatment; it is not implicated whenever individuals who turn out in fact to have had the same condition receive disparate treatment," id. at 144. Therefore, the court ruled, "when an exercise in medical judgment produces a given diagnosis, the decision to prescribe a treatment responding to the diagnosis cannot form the basis of an EMTALA claim of inappropriate screening." Id. Treatment decisions, it found, were fundamentally distinguishable from "disparate treatment of individuals perceived to have the same condition." Id. That kind of treatment remained "the cornerstone of an EMTALA claim," according to the court. Id.

Here, the parties do not contest that Cruz-Vázquez did in fact present symptoms that were perceived by hospital staff as symptoms that would ordinarily trigger the established Protocol. Unlike in Vickers, the hospital staff in this case were not blind to a hidden condition in the emergency patient. Therefore, the evidence she proffers does not go to the failure to properly

-18-

diagnose based on a faulty screening, but rather to a failure to treat her equally to individuals perceived to have her same condition -- vaginal bleeding in their third trimester.  She thus presents the "cornerstone" of an EMTALA screening claim.

The fact that Cruz-Vázquez was eventually discharged from Mennonite's emergency room based on the recommendation of her own treating obstetrician does not change the analysis.  While we cannot grant summary judgment to Cruz-Vázquez at this stage, she has presented evidence that both of her treating physicians were aware of and had identified her symptoms of vaginal bleeding and nevertheless failed to perform the requisite tests which "set the parameters for an appropriate screening" of patients presenting those symptoms -- the "Gravid with 3rd Trimester Bleeding" protocol.  This is insufficient to grant summary judgment outright to Cruz-Vazquez, however, because the evidence in the record is unclear as to whether the physicians may have justifiably treated her differently from other patients presenting like symptoms as a result of additional information they may have had about the patient or her particular condition.[8]  We do nevertheless feel obliged to sound a cautionary note.  While a treating

---

[8]  The record below is also devoid of critical expert testimony and any challenges to said testimony.  This is because the district court issued its judgment after it granted Cruz-Vázquez's motion to appoint an expert witness and Cruz-Vázquez produced his expert report to the defendants but before defendants had the opportunity to depose the expert or submit evidence into the record to challenge the expert witness's report.

-19-

obstetrician's medical judgment may inform whether or not a patient was sufficiently "like" other patients that come under a given hospital protocol, it should not be improperly relied on to entirely bypass the hospital's obligation to equally screen under the statute.  See Correa, 69 F.3d at 1192 ("[A] refusal to follow regular screening procedures in a particular instance contravenes the statute").

### III.  Conclusion

Cruz-Vázquez thus presented sufficient evidence to show that a trialworthy issue exists as to her disparate screening claim.  We accordingly vacate the district court's judgment and remand the case for trial on her EMTALA claim as well as her Puerto Rico law claims. The parties are to bear their own costs in this appeal.

**Vacated and Remanded.**