**Rafael VEGA–FELICIANO, by himself and on behalf of minors J.V.M. and Y.V.M., Plaintiffs,**

v.

**DOCTORS' CENTER HOSPITAL, INC., John Doe, Jane Doe, and Companies X, Y, & Z, Defendants.**

**Civil No. 12–01790 (ADC).**

United States District Court, D. Puerto Rico.

Signed March 30, 2015.

Filed March 31, 2015.

Michelle Annet Ramos–Jimenez, Luis R. Rivera–Rodriguez, Luis Rafael Rivera Law Office, San Juan, PR, for Plaintiffs.

Raphael Pena–Ramon, Pena Ramon & Co., San Juan, PR, for Defendants.

## OPINION AND ORDER

AIDA M. DELGADO–COLÓN, Chief Judge.

Before the Court is defendant Doctor's Center Hospital, Inc.'s ("DCH") Motion for Summary Judgment ("Motion") (**ECF No. 21**), U.S. Magistrate Judge Justo Arenas' Report and Recommendation ("R & R") that the Motion be granted (**ECF No. 48**), and plaintiffs' objections to the R & R (**ECF No. 51**).

On September 23, 2012, plaintiff Rafael Vega–Feliciano ("Vega"), in his own capacity and on behalf of minors J.V.M. and Y.V.M. (Collectively the "Plaintiffs"), filed a complaint against DCH, John Doe, Jane Doe, and Companies X, Y, & Z, pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. **ECF No. 1.**

Plaintiffs claim that the death of Sonia Molina–Rivera ("Molina"), Vega's wife and mother to the minor plaintiffs, was the result of DCH's failure to stabilize Molina's emergency medical condition before transferring her to Auxilio Mutuo Hospital ("AMH"). *Id.* at ¶ 14. On December 9, 2012, DCH filed an answer to the complaint, stating that DCH complied with EMTALA requirements in Molina's screening, stabilization, and transfer. **ECF No. 7,** at ¶ VII–1.

On April 19, 2014, DCH filed the Motion pursuant to Rules 7.1(a), 7.1(d), 7.1(e) and 56(a) of the Local Rules of the United States District Court for the District of Puerto Rico, on the grounds that Plaintiffs failed to state a claim under EMTALA and there are no genuine issues of material facts. **ECF No. 21,** at 4. The Motion was referred to Magistrate Judge Justo Arenas for the issuance of a Report and Recommendation. On September 16, 2014, Magistrate Judge Arenas issued the R & R which recommended granting the Motion

and dismissing the complaint. **ECF No. 48.** On October 9, 2014, Plaintiffs filed a timely opposition to the R & R ("Objection") (**ECF No. 51**), to which DCH responded (**ECF No. 52**).

## I. Procedural Background and Motion for Summary Judgment Standard

Inasmuch as Plaintiffs have not made a specific objection to the Magistrate Judge's recitation of the procedural background and motion for summary judgment standard, the court hereby adopts the same. **ECF No. 48,** at 120–21 and 123–24, ¶¶ 1–2.

## II. Standard of Review for Objections to a Report and Recommendation

■ A district court may refer pending motions to a magistrate judge for a report and recommendation. 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b); L. Cv. R. 72(a). Any party adversely affected by the report and recommendation issued may file written objections within fourteen (14) days of being served with the report and recommendation. Fed.R.Civ.P. 72(d). A party that files a timely objection is entitled to a *de novo* determination of "those portions of the report or specified proposed findings or recommendations to which specific objection is made." *Sylva v. Culebra Dive Shop,* 389 F.Supp.2d 189, 191–92 (D.P.R.2005) (citing *United States v. Raddatz,* 447 U.S. 667, 673, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). "The district court need not consider frivolous, conclusive, or general objections." *Rivera–García v. United States,* Civ. No. 06–1004(PC), 2008 WL 3287236, *1 (D.P.R. Aug. 7, 2008) (citing *Battle v. U.S. Parole Comm'n,* 834 F.2d 419 (5th Cir.1987)).

■ Moreover, to the extent the objections amount to no more than general or conclusory objections to the report and recommendation, without specifying to which issues in the report the party is objecting, or where the objections are repetitive of the arguments already made to the magistrate judge, a *de novo* review is unwarranted. *Id.* "Instead, the report and recommendation is reviewed by the district judge for clear error." *Id.* (citing *Camardo v. Gen. Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) ("It is improper for an objecting party to ... submit[ ] papers to a district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge. Clearly, parties are not to be afforded a 'second bite at the apple' when they file objections to a R & R.")).

■ In conducting its review, the court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate-judge." 28 U.S.C. § 636(a)(b)(1); *see also Templeman v. Chris Craft Corp.,* 770 F.2d 245, 247 (1st Cir.1985); *Alamo Rodríguez v. Pfizer Pharma., Inc.,* 286 F.Supp.2d 144, 146 (D.P.R.2003). Hence, the court may accept those parts of the report and recommendation to which the party does not object. *See Hernández–Mejías v. General Elec.,* 428 F.Supp.2d 4, 6 (D.P.R. 2005) (citing *Lacedra v. Donald W. Wyatt Detention Facility,* 334 F.Supp.2d 114, 125–26 (D.R.I.2004)).

## III. Legal Standard for an EMTALA Claim

■ EMTALA was enacted by Congress to prevent the "dumping" of patients by hospital emergency wards, and to ensure that all patients are treated equally by hospitals regardless of a patient's insurance and socio-economic status. *See Correa v. Hosp. San Francisco,* 69 F.3d 1184, 1189–90 (1st Cir.1995). "EMTALA is a 'limited antidumping statute, not a federal malpractice suit'. *Bryan v. Rectors & Vis-*

*itors of the Univ. of Va.*, 95 F.3d 349, 351 (4th Cir.1996)." *Alvarez–Torres v. Ryder Memorial Hosp., Inc.*, 582 F.3d 47, 52 (1st Cir.2009). Under 42 U.S.C. § 1395dd, a hospital that participates in the federal Medicare program must provide (1) appropriate medical screening to an individual who arrives at its emergency department and a request for examination or treatment is made on his/her behalf, and (2) treatments required to stabilize the individual's emergency medical conditions within the hospital's capability. 42 U.S.C. §§ 1395dd(a) and 1395dd(b)(1)(A).

 EMTALA does not define what an appropriate medical screening consists of; rather, it requires only that a hospital provides uniform screening for all individuals who present similar complaints. *See Cruz–Vázquez v. Mennonite General Hosp., Inc.*, 717 F.3d 63, 69 (1st Cir.2013). A faulty screening on its own is not a violation of EMTALA. *Id.* at 69. The Supreme Court of the United States has held that EMTALA requires hospital to provide stabilization to an individual with an emergency medical condition, but it does not require "appropriate" stabilization. *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 253, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999). An individual is considered stabilized if the individual's emergency medical conditions are not likely, within reasonable medical probability, to deteriorate materially during the transfer of the individual from the hospital to another facility. 42 U.S.C. § 1395dd(e)(3)(B).

EMTALA does not impose restriction on the transfer of an individual if the individual's emergency medical condition has been stabilized. 42 U.S.C. § 1395dd. However, if a hospital does not have the capability to provide treatment required to stabilize a patient's emergency medical condition, the hospital must effectuate an appropriate transfer of the patient to another medical facility with such capability. 42 U.S.C. § 1395dd(b)(1)(B).

## IV. Discussion

### A. Plaintiffs' Objections to the R & R

Plaintiffs' Objection to the R & R is divided into two parts: (1) objections as to relevant facts omitted by Magistrate Judge Arenas in the R & R ("Factual Objections"), and (2) a section entitled "Legal Argument", which objects to the conclusions of law in the R & R ("Legal Objections"). · **ECF No. 51.** In pertinent part, Plaintiffs' objections challenge Magistrate Judge Arenas' factual findings that Molina had been stabilized before she was transferred from DCH, and the legal findings that DCH did not violate EMTALA. *Id.*

 While an objecting party is entitled to a *de novo* review of the portion of the report and recommendation it objects to, no such review is necessary if the party merely repeats in its objection the same arguments it had already made in previous submissions. *See Rivera–García*, 2008 WL 3287236, *1. In this instance, all of plaintiffs' factual objections are assertions previously made in their "Opposing Statement of Material Facts which Bar the Entry of Summary Judgment". **ECF No. 51** at 2–9, ¶¶ 4–42, **ECF No. 33.** As for the legal objections offered by plaintiffs, it is, in fact, an essentially *verbatim* reproduction of plaintiffs' "Memorandum of Law in Support to Opposition to Motion for Summary Judgment for Lack of Subject Matter Jurisdiction and Memorandum of Law in Support Thereof". **ECF No. 51** at 9–16, ¶¶ 43–63, **ECF No. 34.** Since plaintiffs have failed to offer any new arguments in the Objection, a *de novo* review of any part of the R & R is unwarranted, and the R & R will be reviewed under the plain error standard.

### B. Proposed Findings of Fact in the R & R

Magistrate Judge Arenas proposed certain facts for this Court to adopt in the R & R. In pertinent part, Magistrate Judge Arenas found: (1) Molina had a distal pancreatectomy performed at AMH by Dr. Diego Solis ("Dr. Solis") on September 9, 2010; (2) Molina complained of malaise, acute abdominal pain, nausea, vomiting, and difficulty breathing three days after her discharge from AMH; (3) Molina was en route to AMH in an ambulance when the paramedics decided that her condition had so deteriorated that they had to redirect her to DCH's emergency ward; (4) at DCH, several diagnostic tests were performed on Molina and various treatments were administered by the staff to stabilize her condition; (5) Vega testified that Molina was stabilized at DCH; (6) Dr. Osvaldo Niebla, the physician on duty at DCH, decided that it was more appropriate for Molina to continue treatment at AMH, as the doctors who performed her earlier surgery at AMH possessed the specialized knowledge to treat her, which the staff at DCH did not; (7) Vega approved the transfer to AMH; (8) Molina was transferred to AMH; (9) at AMH, Molina was intubated by Dr. Solis and suffered a cardiac arrest; (10) Molina never fully recovered from her cardiac arrest and died on December 10, 2010. **ECF No. 48**, at 121–24, ¶¶ 1–14.

In the Objection, plaintiffs listed thirty-nine (39) facts that they believe Magistrate Judge Arenas erroneously omitted in the R & R. **ECF No. 51** at 2–9, ¶¶ 4–42. As previously stated, plaintiffs did not provide any new arguments or facts in their factual objection, nor did they offer any specific objections to the R & R's Proposed Findings of Fact, which would have necessitated a *de novo* review. *Id.* This Court, thus, reviews the objections for plain errors in the Magistrate Judge's Proposed Findings of Fact.

Part of plaintiffs' factual objections contains assertions which tend to show that Molina's respiratory distress was not stabilized by DCH, and that she was not stable when she was being transferred to AMH. *Id.* Plaintiffs' other factual objections consist of assertions regarding treatments that, according to Plaintiffs, should have been provided to Molina to stabilize her. *Id.* However, Vega testified in a deposition that DCH stabilized Molina while she was in its emergency ward. **ECF No. 21–1**, at 16:15. Furthermore, he testified that Molina's breathing improved when she was at DCH and said improvement did not change while she was at DCH. *Id.* at 16:11–21. Finally, the certificate of transfer (Certificación de Traslado Paciente Sala de Emergencia), which was executed by both Vega and Dr. Niebla, stated that Molina's respiratory rate was 18[1] at 2:50 pm and that she was stable at that time. **ECF No. 21–6**. The record conclusively indicates that Molina's respiratory distress was stabilized by DCH while she was admitted. Thus, assertions by plaintiffs that Molina was not stabilized by DCH, or that Molina was not provided with appropriate treatments to stabilize her, were appropriately omitted from the R & R's Proposed Findings of Fact.

Plaintiffs further assert in their factual objections that Dr. Niebla was not sure

---

1. Molina's respiratory rate was reported to be 28 at the time of her admission at DCH (**ECF No. 33–4**), thus her respiratory rate was significantly lowered while she was in DCH, which contradicts plaintiffs' allegation that DCH failed to lower her respiratory rate. Furthermore, during the deposition of plaintiffs' expert witness, Dr. José Ortiz Feliciano, he admits that the DCH transfer note states that Molina had a respiratory rate of 18 at the time of transfer, and he does not argue that such a respiratory rate is considered unstable. **ECF No. 33–6** at 21, ¶ 4–12.

that Molina's emergency medical condition, her respiratory distress, was not going to deteriorate on her way to AMH, and such uncertainty is a violation of EMTALA. **ECF No. 51** at 6, ¶ 25. However, plaintiff's contention that DCH has to be sure that Molina was not going to deteriorate during transfer is incorrect. A hospital needs only to assure, within reasonable medical probability, that no material deterioration of an emergency medical condition is likely to occur during transfer. 42 U.S.C. § 1395dd(e)(3)(A). *See also Fraticelli–Torres v. Hosp. Hermanos,* 300 Fed. Appx. 1, 4–5 (1st Cir.2008) (A hospital's duty under EMTALA, to provide necessary treatment to a patient to assure, within a reasonable degree of medical probability, that his emergency condition is not likely to deteriorate materially during the transfer, is fulfilled if the patient was stable at the time of his transfer). Vega testified that Molina was stabilized at DCH, and that her breathing was better during her transfer to AMH than it was when she was being taken to DCH. **ECF No. 21–1,** at 19:5–9. The record shows that Molina was not only stable at the time of her transfer, she was stable during her transfer as well. Thus, plaintiffs have failed to show that Dr. Niebla and DCH did not assure, within reasonable medical probability, that Molina's respiratory distress would not materially deteriorate during her transfer to AMH.

After a careful review, this Court finds that Molina was in fact admitted to DCH on September 23, 2010, instead of September 20, 2010. **ECF Nos. 21–3, 21–5, and 21–6.** However, such discrepancy regarding the date of the incident is inconsequential to the issues at bar. The date of Molina's admission to DCH notwithstanding, this Court does not find any plain errors in the R & R's Proposed Findings of Fact. Thus, the R & R's Proposed Findings of Fact, excluding Molina's date of admission to DCH, are hereby adopted.

### C. Proposed Conclusion of Law

█ Magistrate Judge Arenas found that plaintiffs failed to state a claim under EMTALA and that the complaint should be dismissed accordingly. **ECF No. 48,** at 125, ¶ 13. The R & R concluded that Molina was indeed appropriately screened by DCH and treatments within DCH's capabilities were provided to stabilize Molina. *Id.* at 125–26, ¶¶ 13 and 15. As Plaintiffs failed to offer any specific objections to the R & R's Proposed Conclusions of Law, or provide any legal arguments that they have not previously submitted to this Court (**ECF No. 51** at 9–16, ¶¶ 43–63), the R & R's Proposed Conclusions of Law were reviewed for plain errors.

█ Plaintiffs' main contention in their legal objections is that the treatments provided to Molina were inadequate[2] under EMTALA, and that as a result, Molina's emergency medical condition was not properly stabilized before her transfer, which constituted a violation of EMTALA. *Id.* However, as Magistrate Judge Arenas correctly stated in the R & R, EMTALA does not require appropriate treatment, only treatment necessary to stabilize a patient. *See Roberts,* 525 U.S. at 253, 119 S.Ct. 685. As this Court has determined that Molina was indeed stabilized by DCH, DCH had clearly provided the necessary stabilizing treatment required by EMTALA.

As for plaintiffs' claims that additional treatments should have been provided to Molina at DCH, such claims relates to the standard of medical care Molina received,

---

**2.** Plaintiffs alleges that treatments such as a naso-gastric tube, rebreathing mask, or an intubation should have been administered to Molina, and that surgeons should have been consulted in Molina's treatment.

which are Puerto Rico Commonwealth medical malpractice claims and not actionable under EMTALA. *See Alvarez–Torres,* 582 F.3d 47. (EMTALA is intended by Congress to be an anti-dumping statute, and does not create a duty of care for medical services provided to a patient while he is in the hospital).

Parts of plaintiffs' legal objections suggest that DCH did not provide the medical treatment within its capacity to Molina. Based on their expert's testimony that Molina's condition was the "bread and butter for any gastric surgeon", plaintiffs seems to suggest that DCH had the capability to treat Molina's medical condition and thus, her transfer constitute a "dumping" violation under EMTALA. *Id.* at 15, ¶ 60. However, as this Court has already found that Molina's emergency medical condition was properly stabilized, DCH was not restricted by EMTALA from transferring her to another medical facility. 42 U.S.C. § 1395dd(c).

A careful review of the R & R does not reveal any plain errors, thus the Magistrate Judge's proposed conclusions of law are hereby adopted.

## IV. Conclusion

In light of the foregoing, the Report & Recommendation (**ECF No. 48**) is **ADOPTED** in full. The claims against all defendants are **DISMISSED WITH PREJUDICE**. Clerk is to enter judgment accordingly.

**SO ORDERED.**

## *MAGISTRATE JUDGE REPORT AND RECOMMENDATION*

JUSTO ARENAS, United States Magistrate Judge.

## I. PROCEDURAL BACKGROUND

On September 23, 2012, plaintiff Rafael Vega Feliciano in his own capacity and on behalf of minors J.V.M. and Y.V.M. filed a complaint against Doctors' Center Hospital, Inc. (Docket No. 1) for a violation of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, that resulted in the death of Plaintiffs' wife and the mother of the above minors, Sonia Molina Rivera (Docket No. 1, p. 1). Plaintiffs' claim that under the statute, the defendant is liable for all damages caused to Sonia Molina Rivera and to themselves since she died due to a lack of medical treatment and the approval of her transfer from Doctors' Center Hospital to Auxilio Mutuo Hospital without being stabilized (Docket No. 1, pp. 3–4, ¶ 13–15).

On December 9, 2012, defendant Doctors' Center Hospital filed an Answer to Complaint (Docket No. 7) including as an affirmative defense that plaintiffs failed to state a claim upon which relief can be granted because the decedent was properly screened by the hospital; EMTALA does not apply if the physician determined the decedent was stable at the time of transfer; and the hospital complied with the EMTALA requirements of transfer, taking into consideration the decedent's condition and Doctors' Center Hospital's lack of capability to treat her. (Docket No. 7, p. 4, ¶ VII–1).

On April 19, 2014, defendant filed a Motion for Summary Judgment for Lack of Subject Matter Jurisdiction pursuant to Rules 7.1(a), 7.1(d), 7.1(e) and 56(a) of the Local Rules of the United States District Court for the District Court of Puerto Rico (Docket No. 21, pp. 1–2), on the grounds that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law because the Court lacked subject matter jurisdiction due to the inapplicability of the EMTALA provisions (Docket No. 21, p. 9).

On May 27, 2014, plaintiffs responded with a Statement in Opposition to Defendant's Statement of Uncontested Material

Facts [1] (Docket No. 33), with additional material facts, which according to them bar the entry of summary judgment (Docket No. 33, pp. 14–21). They also filed a Memorandum of Law in Support of Opposition to Motion for Summary Judgment for Lack of Subject Matter Jurisdiction and a Memorandum of Law in Support Thereof (Docket No. 34) stating that summary judgment can only be granted when there "is no genuine issue as to any material fact", citing *Sands v. Ridefilm Corp.*, 212 F.3d 657, 660 (1st Cir.2000) (Docket No. 34, pp. 1–3). Plaintiffs allege that there is an existing issue between parties as to whether the defendant adequately complied with EMTALA's requirements (Docket No. 34, pp. 3–9).

Defendant filed a Reply to Response (Docket No. 39) on June 6, 2014, alleging that a summary judgment does ensue because plaintiffs' allegations are "a garden-variety malpractice claim[s] hidden under the short robe of [EMTALA] as evidenced by the same exhibits attached to their motion. Plaintiff's Opposing Statement of Material Facts [w]hich Bars the Entry of Summary Judgment (Docket No. 33) is a summary of what they understand is the standard of care that D[octor's] C[enter] H[ospital] should have followed in the medical care and treatment provided to Mrs. Molina but said response has created no genuine issue whatsoever about the material facts regarding the inapplicability of EMTALA to this case." (Docket No. 39, p. 2).

## II. PROPOSED FINDINGS OF FACT

Having reviewed the statements presented by both parties, I recommend that the Court issue the following findings of fact.

1. On September 9, 2010, Sonia Molina Rivera was operated upon in Auxilio Mutuo Hospital in Río Piedras, due to pancreatitis [2], by Dr. Diego Solís, a hepatic and pancreatic surgeon (Docket No. 21–19, p. 1, ¶ 1; Docket No. 33, p. 1, ¶ 1). A Distal Pancreatectomy [3] was performed, where half of her pancreas, her spleen and a portion of her intestine were removed (Docket No. 21–19, p. 2, ¶ 3; Docket No. 33, p. 1, ¶ 3).

2. Three days after her discharge on September 20, she suffered from malaise [4], became weak and was suffering from acute abdominal pain, nausea, vomiting and had difficulty breathing (Docket No. 1, p. 3, ¶ 9; Docket No. 21–19, p. 2, ¶ 7).

3. Dr. Solís instructed her husband, Mr. Rafael Vega Feliciano, to take her to Auxilio Mutuo's Emergency Room via ambulance (Docket No. 21–19, p. 2, ¶ 8; Docket No. 33, p. 2, ¶ 8).

4. During the trip from her home in Quebradillas, her condition worsened and the paramedics decided to take her to Doctors' Center Hospital in Manatí. (Docket No. 21–19, pp. 2–3, ¶ 9–10; Docket No. 33, pp. 2–3, ¶ 9–10).

5. The physician on duty at Doctors' Center Hospital's Emergency Room, Dr. Osvaldo Niebla, examined her and upon finding her in respiratory distress and de-

---

1. This was included in Docket No. 21 as Appendix A. (Docket No. 21–19).

2. "An inflammation of the pancreas, which may be acute or chronic, asymptomatic, and is often complicated by autodigestion of pancreatic tissue by its own enzymes." *Dorland's Illustrated Medical Dictionary 1367* (32nd ed. 2012) ("Dorland's").

3. "Surgical removal [by remote incision] of all or part of the pancreas." Dorland's at 555 (for *distal*) and at 1367 (for *pancreatectomy*).

4. "A vague feeling of bodily discomfort and fatigue." *Dorland's* at 1097.

hydrated, he ordered several diagnostic tests, including an abdominal and pelvic CT Scan [5], continuous intravenous fluids, the antibiotic Rocephyn [6], Foley to gravity [7], and oxygen via nasal cannula, directed towards stabilizing her condition (Docket No. 21, pp. 17–18; Docket No. 21–19, pp. 3–4, ¶ 16–18, Docket No. 33, pp. 3–4, ¶ 16–18) [8].

6. Dr. Niebla determined that while Mrs. Molina had sepsis [9] she was not in septic shock [10] and that there was no need to decompress her abdomen with a nasogastric tube [11] (Docket No. 21, p. 1; Docket No. 21–19, pp. 4–5, ¶ 21 and 26; Docket No. 33, pp. 4–5, ¶ 21 and 26; Docket No. 33–5, p. 25, lines 1–7), while a CBC [12] and an abdominal CT without contrast [13] showed an infection and extensive free intraperitoneal air [14] (Docket No. 1, p. 3, ¶ 10; Docket No. 21–19, p. 5, ¶ 24).

7. After it was determined by Dr. Niebla that Mrs. Molina had been sufficiently stabilized, it was decided that the best course of action was to continue with the transfer to Auxilio Mutuo, to be examined by her doctor, who possessed the specialized knowledge to treat her which knowledge the personnel at Doctors' Center Hospital lacked. (Docket No. 21, p. 18, Docket No. 21–19, pp. 5–6, ¶ 2832; Docket No. 33, pp. 6–7, ¶ 28–32) [15].

---

5. "A computed tomography [recording of internal body images at a predetermined plane by means of the tomograph or apparatus for moving an x-ray source in one direction as the film is moved in the opposite direction, thus showing in detail a predetermined plane of tissue while blurring or eliminating detail in other planes] in which the emergent x-ray beam is measured by a scintillation counter; the electronic impulses are recorded digitally and then processed by a computer for reconstruction display." *Dorland's* at 1935.

6. "Trademark for a preparation of ceftriaxone sodium [a semisynthertic B-lactamase-resistant, broad-spectrum, third-generation cephalosporin effective against a wide range of gram-positive and gram-negative bacteria; administered intravenously or intramuscularly]." *Dorland's* at 1651 (for *Rocephin*) and at 312 (for *ceftriaxone sodium*).

7. "An indwelling catheter that has a balloon filled with air or liquid to retain it in place in the bladder." *Dorland's* at 306.

8. At Docket No. 33, p. 4, ¶ 17 there is an objection on behalf of plaintiffs regarding the reason given by Dr. Niebla for performing the CT Scan without contrast. However, plaintiffs do admit that an Abdominal CT Scan did take place.

9. "The presence in the blood or other tissues of pathogenic microorganisms or their toxins." *Dorland's* at 1693.

10. "Produced by or due to decomposition by microorganism, putrefactive [enzymic decomposition, especially of proteins, with the production of foul-smelling compounds, such as hydrogen sulfide, ammonia and mercaptans]." *Dorland's* at 1693 (for *septic*) and at 1556 (for *putrefactive*).

11. "Pertaining to the nose and stomach, as in aspiration of the stomach's contents." *Dorland's* at 1232.

12. "Complete Blood Count." *Dorland's* at 310.

13. "The degree to which light and dark areas of an image differ in brightness or in optical density. The difference in optical density in a radiograph that results from a difference in radiolucency or penetrability of the subject." *Dorland's* at 410.

14. "Within the peritoneal cavity. The peritoneum is the serous membrane lining of the abdominopelvic walls and investing the viscera. A strong, colorless membrane with a smooth surface, it forms a double-layered sac that is closed in the male and is continuous with the mucous membrane of the uterine tubes in the female. The potential space between the parietal and visceral peritoneum is called the peritoneal cavity." *Dorland's* at 954 (for *intraperitoneal*) and at 1418–19 (for *peritoneum*).

15. On Docket No. 3, pp. 6–7, ¶ 28–32, plaintiffs disagree with Dr. Niebla's reasoning about decedent's condition at the time, but they admit that his determination was that the

8. According to plaintiff and patient's husband, Doctors' Center Hospital called Auxilio Mutuo Hospital previous to the transfer and Auxilio Mutuo was expecting her, while plaintiff Vega Feliciano consented because it was where she had been originally operated upon. (Docket No. 21, Exhibit No. 1, p. 17, Docket No. 21, p. 6, ¶ 37; Docket No. 33, p. 9, ¶ 37).

9. En route to Auxilio Mutuo, the decedent's breathing appeared to be better than before her arrival at Doctors' Center Hospital. (Docket No. 21–1, pp. 36–37, Docket No. 21–19, p. 7–8, ¶ 45–46, Docket No. 33, pp. 11–12, ¶ 45–46) [16].

10. After she arrived at Auxilio Mutuo, she was examined by a physician at the Emergency Room, who reviewed the exams sent by Doctors' Center Hospital and then proceeded to consult with Mrs. Molina's doctor. (Docket No. 21–19, pp. 9–10, ¶ 50–52; Docket No. 33, p. 13, ¶ 50–52).

11. Dr. Solís decided to perform an intubation [17], after which she went into cardiac arrest. He resuscitated her and performed an exploratory laparotomy [18]. (Docket No. 21–19, pp. 8–9, ¶ 52–57; Docket No. 33, p. 13, ¶ 52–57).

12. His report on the operation indicates that she tolerated the surgery but remained in critical condition after her cardiac arrest. (Docket No. 21–15, p. 3, Docket No. 21–19, p. 9, ¶ 58).

13. Decedent remained hospitalized and unconscious at Auxilio Mutuo Hospital from her arrival date on September 23, 2010 until December 7, 2010, with a discharge diagnosis of Anoxic [19] Encephalopathy [20], (Docket No. 33–11, p. 1), caused by deprivation of oxygen to the brain. (Docket No. 33–6, p. 36, lines 17–24).

14. She was taken by her husband to a care facility in Hatillo, where she died on December 10, 2010. (Docket No. 33–2, pp. 39 line 16 to 41 line 11).

## III. PROPOSED CONCLUSIONS OF LAW

Based upon the above proposed findings of fact, I recommend the following conclusions of law.

1. "In order to prevail on a motion for summary judgment, the moving party must show 'that there is no genuine dispute as to any material fact' and that it 'is

---

patient was stable enough to transfer. However, they argue that Dr. Niebla did not have the sufficient data to make that determination.

16. Plaintiffs admit that Rafael Vega Feliciano did notice the decedent's breathing being better, but claim that he was not aware of his wife's condition at the time of transfer and that what he noticed was the decedent's breathing slowing down because she was getting tired of breathing. (Citing Docket No. 33–6, p. 33, lines 5–7, Expert Witness Dr. José Ortiz Feliciano's Deposition).

17. "The insertion of a tube into a body canal or cavity. [Tube] is inserted into the trachea through the mouth, the nose, or a tracheostomy for administration of anesthesia, maintenance of an airway, aspiration of secretions, ventilation of the lungs, or prevention of entrance of foreign material into the tracheo-

bronchial tree." Dorland's at 955 (for intubation) and at 1976 (for endotracheal).

18. "Surgery for diagnostic purposes, into the abdominal cavity." Dorland's at 661 (for exploratory) and at 1005 (for laparotomy).

19. "Anoxia [is] the total lack of oxygen, often used interchangeably with hypoxia to mean a reduced supply of oxygen to the tissues. Anoxic result[s] from interference with the source of oxygen." Dorland's at 97.

20. "Degenerative disease of the brain caused by hypoxia from either decreased rate of blood flow or decreased oxygen content of arterial blood; symptoms in mild cases include intellectual, visual, and motor disturbances. Severe cases, such as with cardiac arrest or blocking of the airways, can cause permanent damage within five minutes." Dorland's at 614–15.

entitled to judgment as a matter of law.' Fed.R.Civ.P. 56(a); see *Baltodano v. Merck, Sharp and Dohme (I.A.) Corp.*, 637 F.3d 38, 41 (1st Cir.2011)." *OneBeacon America Ins. Co. v. Commercial Union Assur. Co. of Canada*, 684 F.3d 237, 241 (1st Cir.2012); see also *Nieto–Vicenty v. Valledor*, 984 F.Supp.2d 14, 16 (D.P.R. 2013).

2. "In *Celotex [Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ] the Supreme Court stated that Fed.R.Civ.P. 56(c) 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' 477 U.S. at 322, 106 S.Ct. 2548 [ (1986) ]." *Sánchez–Rodríguez v. AT & T Mobility Puerto Rico, Inc.*, 673 F.3d 1, 10 (1st Cir.2012).

3. The Emergency Medical Treatment and Active Labor Act, also known as EMTALA, was enacted by Congress "to prevent the unsavory practice known as patient 'dumping', whereby hospitals precipitously discharged or transferred to other hospitals patients who were unable to pay for their healthcare, in many cases even before the hospital determined whether the patient had a critical medical condition which was likely to deteriorate after discharge or during the inter-hospital transfer. *See Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1189–90 (1st Cir. 1995)." *Fraticelli–Torres v. Hospital Hermanós*, 300 Fed.Appx. 1, 3 (1st Cir. 2008).

4. "EMTALA is a "limited antidumping statute, not a federal malpractice suit." *Bryan v. Rectors & Visitors of the Univ. of Va.*, 95 F.3d 349, 351 (4th Cir.1996)." *Alvarez–Torres v. Ryder Memorial Hosp., Inc.*, 582 F.3d 47, 52 (1st Cir.2009); see also *Reynolds v. MaineGeneral Health*, 218 F.3d 78, 83 (1st Cir.2000); *Maldonado–Rodriguez v. St. Luke's Memorial Hosp., Inc.*, 940 F.Supp.2d 30, 35 (D.P.R. 2013).

5. In the case of *Morales v. Sociedad Española de Auxilio Mutuo y Beneficencia*, 524 F.3d 54, 57–58 (1st Cir.2008), the court summarizes EMTALA's requirements as follows:

The statutory scheme [of 42 U.S.C. § 1395dd(e)(2) ] imposes a variety of obligations on covered institutions [any hospital that participates in the federal Medicare program]. First, 'if any individual … comes to the emergency department [of a covered hospital] and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening evaluation.' *Id.* § 1395dd(a). Second, if the screening examination discloses that the individual suffers from an emergency medical condition, the hospital must provide necessary stabilization. See *id.* § 1395dd(b)(1).

6. In *Ramos–Cruz v. Centro Médico del Turabo*, 642 F.3d 17 (1st Cir.2011) the court noted that under EMTALA "a transfer is only appropriate where 1) the transferring hospital provides 'the medical treatment within its capacity which minimizes the risks to the individual's health,' 2) the receiving facility has available space and qualified personnel, as well as agrees to accept the transfer and provide the appropriate treatment, 3) the transferring hospital sends all medical records related to the condition available at the time of transfer, and 4) the patient is transported through qualified personnel and transportation equipment. 42 U.S.C. § 1395dd(c)(2)." *Id.* at 18.

7. The Supreme Court of the United States stated in *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 253, 119 S.Ct.

685, 142 L.Ed.2d 648 (1999) that "[T]he text of § 1395dd(b) does not require an "appropriate" stabilization ...". *See Kenyon v. Hospital San Antonio, Inc.*, 951 F.Supp.2d 255, 265–66 (D.P.R.2013); *cf. Fuentes Ortiz v. Mennonite General Hospital*, 106 F.Supp.2d 327, 332 (D.P.R.2000); *Lopez–Soto v. Hawayek*, 175 F.3d 170, 173 (D.P.R.1999). However, in an emergency situation, an EMTALA hospital must render the services necessary to stabilize the patient's condition unless transferring the patient to another facility is medically indicated and can be accomplished with relative safety. *Ramos–Cruz v. Centro Médico del Turabo*, 642 F.3d 17, 19 (1st Cir. 2011), cited in *Reyes–Morales v. Hospital General Menonita, Inc.*, 2013 WL 1089752 at *1 (D.P.R. March 15, 2013).

8. EMTALA is not a standard to evaluate hospitals' treatments and procedures; it is directed towards guaranteeing equal treatment to all who seek emergency medical services. "EMTALA does not define what an appropriate medical screening consists of, but we have defined a participating hospital's duty as providing examination 'reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints. The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly.' [*Correa v. Hospital San Francisco*, 69 F.3d] at 1192 ..." *Cruz–Vázquez v. Mennonite General Hosp., Inc.*, 717 F.3d 63, 69 (1st Cir.2013); *see Roberts v. Galen of Virginia, Inc.* 525 U.S. at 252–53, 119 S.Ct. 685.

9. In *Ramos–Cruz v. Centro Médico del Turabo, supra*, the Court held that the district court's opinion conformed with this circuit's "[...] jurisprudence interpreting the [...] EMTALA phrase, 'appropriate medical screening examination within the capability of the hospital's emergency department' 42 U.S.C. § 1395dd(a). In that context we held that 'refusal to follow regular screening in a particular instance contravenes the statute ... but faulty screening, in a particular case ... does not contravene the statute.' *Correa*, 69 F.3d at 1192." *Id.* at 19.

13. Applying the provisions in 42 U.S.C. § 1395dd to this case, it is clear that plaintiffs have failed to state a claim under EMTALA. Movant and nonmovant demonstrated that once decedent arrived at Doctors' Center Hospital, a screening procedure did take place and the appropriate treatment was provided [21]. It was not until a doctor certified that the decedent was stable enough to proceed with the transfer [22], that Auxilio Mutuo Hospital was notified and agreed to her transfer, and with her husband's approval, that Mrs. Molina was discharged from Doctors' Center Hospital and sent to Auxilio Mutuo [23].

15. Whether or not the treatment received at Doctor's Center was adequate or sufficient is not a question that is covered by EMTALA requirements. *See Ramos–Cruz v. Centro Médico del Turabo*, 642 F.3d at 18, citing *Correa v. Hosp. San Francisco*, 69 F.3d at 1192–93. As long as the hospital performed a screening procedure and provided treatment within its capabilities, then no violation of 42 U.S.C. § 1395dd occurred. *See Cruz–Vázquez v.*

---

**21.** Docket No. 21, pp. 17–18; Docket No. 21–19, pp. 3–4, ¶ 16–18, Docket No. 33, pp. 3–4, ¶ 16–18.

**22.** Docket No. 21, p. 18, Docket No. 21–19, pp. 5–6, ¶ 28–32; Docket No. 33, pp. 6–7, ¶ 28–32.

**23.** Docket No. 21, Exhibit No. 1, p. 17, Docket No. 21, p. 6, ¶ 37; Docket No. 33, p. 9, ¶ 37.

*Mennonite General Hosp., Inc.,* 717 F.3d at 69.

16. There is no genuine issue of material fact related to the lack of an EMTALA violation by Doctors' Center Hospital, and the defendant is entitled to judgment as a matter of law.

## IV. CONCLUSION

For the reasons stated above, I recommend that the court grant the defendant's Motion for Summary Judgment for Lack of Subject Matter Jurisdiction and dismiss the complaint.[24]

Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within fourteen (14) days of the party's receipt of this report and recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. Failure to comply with this rule precludes further appellate review. Fed.R.Civ.P. 72(b)(2); *see Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. DeJesus–Viera,* 655 F.3d 52, 57 n. 1 (1st Cir.2011); *Davet v. Maccarone,* 973 F.2d 22, 30–31 (1st Cir.1992); *Velazquez v. Abbott Laboratories,* 901 F.Supp.2d 279, 288 (D.P.R.2012).

In San Juan Puerto Rico this 16th day of September, 2014.

---

24. Marielia Isla Torres, a third-year student at University of Puerto Rico School of Law, provided substantial assistance in researching and preparing this report and recommendation.